Filed 7/16/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S056842 |
| v. | ) | |
| | ) | |
| JOHN ALEXANDER RICCARDI, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. A086662 |
| | ) | |
| _____ | ) | |

A jury found defendant John Alexander Riccardi guilty of the first degree murders of Constance (Connie) Navarro and Susan (Sue) Jory by use of a firearm. (Pen. Code, §§ 187, subd. (a), 12022.5, subd. (a).)[1] The jury also found true the special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)) and that defendant committed Connie's murder while engaged in the commission of a burglary (§ 190.2, subd. (a)(17)). Subsequently, the jury fixed the penalty at death.

This appeal is automatic. (§ 1239, subd. (b).) We reverse the judgment of death because of the erroneous excusal of a prospective juror during jury selection. We also reverse the burglary special circumstance and one of the two multiple-murder special-circumstance findings, but the judgment is affirmed in all other aspects.

---

[1] Hereafter, undesignated statutory references are to the Penal Code.

# I. FACTS AND PROCEEDINGS

## A. Guilt Phase

### 1. Prosecution's case

#### a. Background of the relationship

Defendant and one of the victims, Connie, began dating in 1980. During their relationship, defendant had his own residence, but stayed at Connie's condominium frequently. Connie had a teenage son, David Navarro, and she shared joint custody of him with his father, her ex-husband, James "Mike" Navarro. David became close to defendant and regarded him as a trusted friend. In the fall of 1982, defendant's relationship with Connie began to unravel, with frequent breakups followed by brief reconciliations. In January 1983, Connie firmly decided to end the relationship and no longer wanted to see defendant.

Over the next two months, defendant had difficulty coping with the breakup and began stalking Connie. On March 3, 1983, he killed Connie and her friend, Sue Jory. During the two-month period, defendant appeared uninvited at restaurants where Connie was dining and at dinners at her ex-husband's house. Connie received multiple phone calls, but the calling party would hang up after she answered. On some occasions, defendant followed Connie and her friend, Marilyn Young, to a fitness center, and stood outside staring at Connie through the center's picture window while she exercised. Defendant also began making midnight phone calls to Young, to inquire about Connie and to express his despair. Connie became frightened by defendant's behavior, avoided going anywhere alone, and had an alarm system installed at her residence. Defendant, who enjoyed a secret life as a burglar, would later put his burglary skills to use at Connie's home.

Several witnesses testified regarding specific instances of defendant's stalking of Connie during the two months leading to her death.

### b. The George Hoefer incident and other incidents in January 1983

In early January 1983, George Hoefer, an executive for an advertising agency, met with Connie at a restaurant to discuss a job opportunity. After the dinner, as they parted ways in the parking lot, George and Connie shook hands and Hoefer kissed Connie on the cheek. The following morning at his hotel room, Hoefer received a telephone call from a man with a New York or New Jersey accent who identified himself as Connie's boyfriend.[2] The man was enraged and demanded to know why Hoefer had been kissing his girlfriend. The man warned Hoefer that if he did not stop seeing Connie, the man would " 'break her knees.' " Hoefer tried to calm the man by explaining that he was happily married and that he had no romantic involvement with Connie. The following day, Hoefer received a second telephone call from the same man. The man revealed that he knew Hoefer's flight itinerary back to Connecticut and his home address there. The man asked how Hoefer would like it if he paid a visit to Hoefer's wife in Connecticut. Hoefer again explained that he was not romantically involved with Connie, and assured the man he was returning home. The man became calm and asked Hoefer not to tell Connie about the conversation. Hoefer testified that papers in his rental car contained his personal information, address, and his flight itinerary. Upon returning to Connecticut, Hoefer told Connie about the threatening telephone calls.

---

[2]     Defendant is originally from Yonkers, New York and has an accent reflecting that region.

After this incident, defendant's stalking escalated. According to Connie's friend, Marilyn Young, in mid or late January 1983, defendant broke into Connie's condominium and forced her to sleep with him. He spent the night holding her and refused to allow her to leave the bed. Near the end of January 1983, according to Young, Connie's vehicle failed to start, and defendant suddenly appeared and told Connie he had tampered with the wires. On January 31, 1983, based on an entry in her day planner, Connie had her locks changed.

### c. The weekend "kidnapping" and other events in February 1983

According to Young, in early February 1983, Connie agreed to meet with defendant to discuss his behavior, but only if their meeting took place at a public restaurant. Young was to pick Connie up from that meeting, but before Young arrived, defendant brandished a gun and demanded that Connie go away with him for the weekend. Connie, fearing for her life, agreed, hoping to calm defendant. She convinced him to rent a hotel room in the Los Angeles area, where she felt it was less likely that he could harm her without anyone else hearing. During the weekend with defendant in the hotel room, Connie made telephone calls to her friends and family explaining where she was and who she was with. In those telephone calls, Connie sounded nervous. At the end of the weekend, defendant allowed Connie to leave. In their testimony, Young and Connie's ex-husband, Mike, characterized this incident as a kidnapping.

In mid-February 1983, Connie invited defendant to dinner at a restaurant with Young and her boyfriend. According to Young, both she and Connie pleaded for defendant to leave Connie alone. Defendant said he would leave Connie alone, but, according to Young, he had an angry smirk on his face.

Soon after this incident, Connie and her friend, Sue Jory, were having breakfast with their friend, Craig Spencer, when defendant suddenly appeared and

4

sat down at their table uninvited.  According to Spencer, defendant said nothing and merely stared at Connie for three to four minutes.  Because Connie and Sue became visibly agitated and nervous, Spencer tried to break the silence by introducing himself to defendant.  Defendant said nothing, but shook Spencer's hand, stood up, and then made a gesture with his forefinger and thumb, in the shape of a gun, pointed it at Connie, and dropped his thumb, as if he was pulling a trigger.  He then quietly walked away.

In late February 1983, Connie had difficulty operating the sliding glass door in her bedroom, which opened onto a second-floor balcony.  Her neighbor, Carl Rasmussen, discovered that the sliding door's bolt latch had been damaged, and, when he removed the latch to inspect it, he realized it had been sawed almost all the way through.  According to Rasmusson, the damage to the latch could have been made only by someone inside Connie's bedroom.  Rasmussen attempted to fix the latch and reinstalled it.

At about this time, Connie expressed her fears of defendant in a draft letter addressed to defendant dated February 18.[3]

Connie wrote:  "I'm so sorry that you're still so angry and you feel a need for vengeance and punishment.  You're accomplishing your goal.  I feel like a walking dead person going through the motion of life.  Like a small wild animal who knows it's surrounded by a pack of wolves.  The smallest sound or movement makes me jump.  The sound of the phone now is frightening.  Another hang-up. . . .  I'm so locked up in my own house afraid of every sound the walls have

---

[3]    Mike discovered the draft letter on a notepad while cleaning Connie's condominium after her death.  According to Mike, Connie had a habit of writing rough drafts of her letters on a notepad.

5

probably always made.  I walk out of my house, a coffee shop, a gym, looking.

Terror.  Until I get into my car and I know that the doors are locked and I can

breathe again until I get out.  Then it starts all over again.  How long is it going to

go on?"

### d. *The break-in incident involving David Navarro*

Sometime in the last week of February 1983, defendant broke into Connie's

home while Connie's 15-year-old son, David, was home sick, instead of being at

school.  According to David, after his mother left on her routine morning jog, he

heard the sound of someone trying to enter the sliding glass door to his mother's

bedroom.  David caught a glimpse of defendant outside on the balcony trying to

remove the sliding glass door from its track.  David became frightened and hid in

the bathroom behind the shower curtain.  David heard defendant enter the

bathroom in which he was hiding, then exit the bathroom and walk downstairs.

He then heard the sound of the answering machine being played back.  David saw

that a gun had been placed on the bathroom floor near the door.  He left the

bathroom and called out to defendant, asking if he or his mother was home and if

someone was "trying to break in."  Defendant went upstairs, showed David the

sliding door, which was back on its tracks, and assured him that no one had broken

in.  Out of fear, David pretended to go along with defendant's assurances.  While

sitting at the edge of Connie's bed, defendant told David that he was very upset

that his mother did not want to see him anymore and said he was going to kill

himself but wanted to talk with David's mother first.  Defendant then pulled out a

gun from under the bed and pointed it at David, but said he was going to kill

himself.  Defendant apologized and told David that he was not going to hurt him,

but then produced a pair of handcuffs and handcuffed David in the bathroom.

Defendant left the bathroom, saying that he had to deal with David's mother, and closed the door behind him.

A half hour later, when Connie returned home, David could hear defendant and his mother arguing loudly, and heard his mother demand to know where David was. The argument lasted 20 to 30 minutes, and, at one point, David heard the sound of someone being slapped. Defendant, sobbing, returned to the bathroom, uncuffed David, and begged him not to tell his mother. Defendant later left without further incident. Because David was afraid of defendant, he did not tell his mother what had happened earlier, but a few weeks after his mother's death, he described the incident to a deputy district attorney.

### e. The weekend before the killings

Young described the circumstances surrounding Connie's decision to leave her home the weekend before the killings. On approximately February 25, 1983, one of Connie's friends warned Connie that defendant's astrological "signs" showed that he was in a "rage" and was going to "erupt" during that weekend. Donnie Clapp, a mutual friend of Connie's and defendant's, also warned her that defendant had been breaking into Connie's home and that he appeared to be in a "rage." Clapp advised her to leave. Because Connie no longer felt safe in her home, she and Young decided to stay out of town for the weekend. Before they left, Connie told Young that defendant had called wanting to know where she was going that night. When Young arrived to pick up Connie, defendant was outside Connie's home, staring at them. According to Young, defendant had a "very kind of frightened look on his face." When they drove away, defendant initially followed them in his car.

After returning from her weekend away, Connie decided that she and David should stay at her ex-husband Mike Navarro's residence. When Connie and David

7

briefly returned home to pick up clothes, they discovered someone had disabled the front door alarm. According to Young, Connie later learned from Clapp that defendant was inside the condominium, hiding in a closet, while she and David picked up their clothes. According to Young, Clapp told Connie that defendant admitted to him that he had broken into her home through a skylight.

### f. *The days leading to the killings*

On the morning of March 1, 1983, two days before the killings, Mike's answering machine recorded a telephone call between Connie and an unidentified female in which Connie asked questions about how to obtain a restraining order. Later that day, Connie met with an attorney, whom Mike had recommended, to discuss obtaining a temporary restraining order against defendant.[4]

On March 2, 1983, the day before the killings, Connie, her friend Marilyn Young, and Sid Young (Young's ex-husband), were eating breakfast at a restaurant when defendant appeared uninvited. Defendant persuaded Connie to move to an empty table where they could speak more privately, but Young heard Connie accuse defendant of breaking into her home and disabling her alarm system and heard defendant admit that he had done so. Defendant then admitted that he had taken something from Connie's home, and showed Connie a letter she had written to him but had not yet sent. He claimed that "there are no locks that

---

[4]     Although the tape does not identify a date and no witness directly established the date of Connie's call or her appointment with an attorney, the date of these events can be inferred from other evidence. In this recording, Connie states she is scheduled to meet with an attorney later that morning about obtaining a restraining order. Mike Navarro testified that he recommended an attorney named *Gerald* Sherman to advise her about obtaining a restraining order, and Connie's day planner for March 1, 1983, lists a 9:30 a.m. appointment with a person named "Gerry."

could keep me out of anyplace" and that, if he had wanted, he could have hurt her anytime. He also stated, "I could hurt you right here and nobody would do anything." Defendant explained that he wished Connie had sent him the letter earlier because he had not believed that she cared about him until he read it. Defendant promised Connie that he would not bother her anymore and that she could return home. As defendant was leaving, Young observed that defendant looked "horrible" and "scary," as if he had not been able to sleep. She suggested to defendant that he admit himself into a hospital, but he rejected the idea with a laugh.

After defendant left, Connie decided to return to her home that night, against the advice of her ex-husband Mike, but she agreed to let David stay at his father's house.

### g. *The night of the killings*

On March 3, 1983, the night of the killings, Connie, Sue Jory, and Young planned to go out for dinner and drinks, but Young's plans changed and she was unable to attend.

Just hours before the killings, defendant met Stephanie Brizendine, a former girlfriend, and her friend, Toni Natoli, at a restaurant. Even though Brizendine did not know Connie and could not remember the last time she had seen defendant, defendant seemed interested only in telling her about the problems he was having with Connie. When discussing Connie, defendant sweated profusely and appeared to be nervous and agitated. At one point, defendant showed Brizendine a letter Connie had written him. Brizendine was stunned to read Connie's description of how she was "absolutely living in fear" due to defendant. In the letter, Connie mentioned defendant breaking into her residence, and begged defendant to leave her alone. Defendant seemed nonchalant about

9

Connie's fears. Brizendine told defendant that he should leave Connie alone and move on with his life.

When they left the restaurant, defendant led Brizendine to a pay phone and, before dialing the phone, instructed her that if a boy answered, she should tell him that Dean loved him, and if a woman answered, she should ask for Dave. When they called, no one answered, and an answering machine activated. Defendant told Brizendine to hang up and then said, "That fucking bitch, Connie, is not answering the phone."

Brizendine accompanied defendant to his car, and thought that she saw a gun in his trunk.[5] After saying goodbye, defendant drove away sometime between 10:00 and 10:30 p.m. As defendant departed, he seemed agitated and angry, and said nothing about leaving town the next day. Connie's residence was only four miles away.

Sometime between 10:30 and 11:00 p.m., Connie's neighbors heard the sounds of gunshots and several muffled thumps. Approximately 15 to 20 minutes later, a neighbor saw a large man, whom she could not identify, leave Connie's residence and drive away in Connie's vehicle.

### h. The scene of the killings

On March 4, 1983, Mike found Connie and Sue shot to death in Connie's home. Connie's body had been stuffed into the second-floor linen closet with a pillow over her face, and Sue's body was found facedown in Connie's bedroom.

---

[5] Brizendine acknowledged that, when she first talked to police about her meeting with defendant, she did not mention seeing a gun in his trunk. But she also explained that the police did not ask about any gun, and it was not out of character for defendant to have a gun in his possession.

From bloodstains and drag marks on the carpet, it appeared that Sue's body had been moved from David's bedroom to Connie's.[6]

Connie had received two gunshot wounds. The first bullet entered the left side of her chest, passed through her left lung, and exited her back. The second bullet entered on the right side of her chest, passed through the aorta and the spine, and stopped at the back of the left chest near the fifth rib. Sue was shot once at close range, possibly as close as two inches. That bullet penetrated through her left hand at the base of her thumb, exited, and then entered her jaw area, tore through her left carotid artery, and exited through the back of her neck. The injury to Sue's left hand may have been a defensive wound, because it was consistent with her raising her hand to defend against the assailant. The bullets recovered from the scene were .38 or .357 caliber[7] and were most consistent with having been fired from a .38-caliber Colt handgun.

Connie's and Sue's purses had been stuffed into a closet in Connie's bedroom. The only items that were identified as missing from the residence or the victims were their car keys. Both Connie's and Sue's vehicles had been moved from outside Connie's home and parked two blocks away in opposite directions.

Connie's condominium bore no signs of a forced entry. A skylight in Connie's bathroom, however, appeared to be askew and slightly off its frame.

---

[6] During the presentation of defense evidence, a forensic pathologist, Dr. Irving Root, examined the deputy coroner's reports and photographs of discolorations on Sue's body and concluded that her body had been moved hours after her death. The prosecutor presented a witness in rebuttal, Dr. Eugene Carpenter, who stated that the discolorations may have occurred while Sue's body was transported to the coroner's office.

[7] Despite the label, a .38-caliber bullet is not .38 inches in diameter but has the same diameter as a .357-caliber bullet.

Because of its height from the floor, the police at the time believed it was unlikely the perpetrator could have entered the residence from the skylight; accordingly, they did not check it for fingerprints and did not photograph it.

Defendant's fingerprints were located on the linen closet door where Connie's body was found. In addition, on the kitchen counter were some wine glasses and a glass pitcher. One of the wine glasses and the pitcher bore Connie's fingerprints, but a print obtained from a second wine glass was too incomplete for matching.[8] With the exception of three prints, all the latent prints lifted from Connie's household matched either Connie or defendant. The three remaining prints — those lifted from a dining room telephone, Connie's bedroom door, and the doorjamb of the linen closet — did not match Connie, David, Sue, Mike, or defendant.

### i. Defendant's flight and arrest

Defendant left Los Angeles immediately after the killings, abandoning his car, his motorcycle, his apartment, and virtually all of his possessions. At defendant's apartment, the police found ammunition, three handguns, a shotgun, and a box for a .38-caliber Colt handgun, but they did not find a .38-caliber Colt handgun or .38-caliber ammunition. In addition, the police recovered four sets of handcuffs. Later in March 1983, a warrant was issued for defendant's arrest.

Defendant was apprehended nearly eight years after the killings, following a nationwide broadcast of a televised program detailing defendant and the

---

[8] In 1983, however, a different analyst concluded that some of the prints from the wine glasses were sufficient for matching but did not match Connie, David, Sue, Mike, or defendant. By the time of trial, a different analyst disagreed and concluded that these same prints matched Connie's.

homicides.[9] At the time of his arrest in January 1991, defendant was living in Houston and making a living as a burglar using various aliases. According to the FBI, defendant was a suspect in more than 100 burglaries in the Chicago, Los Angeles, Miami, and New York areas. He had undergone plastic surgery to his face, having his nose shortened and a mole removed. Evidence found inside defendant's Houston home showed that, a few days after the killings, he had obtained documents instructing how to change his identity, and by the end of the month he had applied for a passport under the name of another person.

In April 1991, while at a hearing in a federal court in Houston, defendant tried to escape by kicking out a 10th-floor window. Defendant remained on the 10th-floor ledge for almost 12 hours, threatening to jump, but was eventually coaxed back inside.

### j. Defendant's admissions

Defendant's occasional burglary partner-in-crime, Samuel Sabatino, testified that, before the homicides, defendant told him that Connie had left him, and he "felt like he was going to kill himself and that he was going to kill her." Several weeks later, defendant admitted to Sabatino that he had committed the killings. According to Sabatino, defendant explained that he broke into Connie's home through a skylight and waited for her to come home. When she arrived home, her friend, Sue Jory, was with her. Connie went upstairs, where defendant confronted her. During an ensuing argument, defendant shot Connie. When Jory came upstairs, defendant shot her as well. Defendant told Sabatino he used either a .38- or a .32-caliber weapon and bragged that he hid the weapon under law

---

[9] A videotaped recording of the program was found in a VCR at defendant's Houston residence.

13

enforcement's "noses" by concealing the gun under some roofing material on the roof of his apartment.

Sabatino confirmed that he had suffered three burglary-related felony convictions and was testifying against defendant pursuant to a plea agreement in return for a reduced sentence. Sabatino also admitted that he wanted to "get even" with defendant because defendant had never repaid a $100,000 loan and because defendant had provided information to the FBI that led to Sabatino's arrest.

Defendant's stepmother, Rosemary Riccardi, testified that soon after the killings, defendant admitted to his father that he committed the homicides. Defendant's father died in 1986. Rosemary claimed that, in addition to relaying this information in a meeting with an FBI agent only three weeks prior to her testimony, she also had disclosed defendant's admission to the FBI during the 1980's. She denied writing a story about the killings, but admitted she had expressed some interest in writing about defendant's upbringing because she thought it would make an interesting book.

### 2. Defense case

#### a. Rebuttal of Rosemary Riccardi's testimony

Defendant called two witnesses to rebut his stepmother's testimony.

First, FBI Special Agent Gary Steger testified that while defendant was a fugitive, there were 27 reported contacts between Rosemary and the FBI, and none of the reports document that Rosemary relayed that defendant had admitted to the killings.

Second, defendant's cousin, Mario Ragonesi, testified that while defendant was a fugitive, Rosemary had repeatedly spoken of her desire to write a book about defendant's life and had discussions with him and other family members in order to research defendant's history. Finally, Ragonesi recounted that Rosemary

14

repeatedly told him she thought defendant was innocent of the homicides and never mentioned anything about an admission.

### b. *Defendant's testimony*

Defendant testified in his own defense. He denied shooting Connie and Sue, but he admitted he felt depressed and suicidal as a result of his breakup with Connie. He also admitted he called Connie frequently, to the point of annoying her.

He acknowledged, to varying degrees, the encounters he had with Connie in the two months preceding the killings, but denied he was stalking Connie and explained that most of his encounters were due to coincidence because they had the same favorite restaurants and her fitness center was along his regular jogging route.

As to the incident involving George Hoefer, defendant denied following Connie and Hoefer and claimed that he inadvertently saw them at a table at a restaurant that he and his friend had entered. Defendant admitted that he later spoke with Hoefer over the telephone at Connie's home after grabbing the phone from her when she received a telephone call. He acknowledged he had exchanged angry words with Hoefer and then hung up on him. Defendant admitted he was jealous but denied knowing where Hoefer was staying, knowing his airline information, or threatening to break Connie's knees.

Defendant also denied accosting Connie and kidnapping her over a weekend. He claimed instead that Connie willingly stayed with him at a hotel. Defendant admitted to meeting Craig Spencer, Connie, and Sue Jory at a restaurant, but he denied remaining mute or feigning the pointing of a gun at Connie's head.

15

Defendant corroborated, to a large extent, David's account of defendant breaking into his mother's home while David was sick at home and not at school, but defendant claimed he had entered Connie's home through a partially open sliding glass door after no one answered the front door. He denied ever pointing a gun at David or handcuffing him, but claimed, instead, that he told David to stay in his bathroom because he did not want him to be a witness in case he shot himself.[10] According to defendant, after Connie arrived, she calmed defendant down and convinced him not to kill himself. Following their talk, he and Connie went to David's bathroom and told him everything was fine and that defendant was not going to kill himself.

Defendant also acknowledged he met with Connie at breakfast the day before the killings to discuss a letter she had written to him, but he denied breaking into Connie's home and stealing that letter. He claimed he broke into Connie's home only once — the incident in which David was home. He also denied telling Connie that if he wanted to hurt her, he could have done so. He claimed he told Connie that morning of his plan to fly to New York for a few weeks.

Defendant admitted meeting Brizendine at a restaurant and discussing Connie with her on the night of the killings. He could not remember if he showed her a letter Connie had written him. He admitted that he had Brizendine call Connie's home because he was afraid Connie would not pick up the phone if she heard his voice. He denied giving Brizendine instructions about what to do if David answered. He also denied having a gun in his car.

---

[10] Defendant later admitted that he would frequently carry handcuffs while committing burglaries in case "somebody would happen to come about."

16

Defendant testified that he did not go to Connie's condominium on the night of the killings, but was at home that night and left in the morning on a flight to New York to visit his terminally ill aunt. He claimed his friend, Michael Hammerman, who was deceased by the time of trial, drove him to the airport. He asserted that he did not learn about the killings until days later when Hammerman informed him over the telephone and warned him that he was a suspect. According to defendant, when he learned he was a suspect, he decided not to return to Los Angeles because he was afraid of being convicted of a crime he did not commit.

Defendant admitted to having prior felony convictions for burglary, possession of stolen goods, and possession of a firearm by a convicted felon. He acknowledged that he had committed other uncharged burglaries in several different states. Defendant also admitted to having had his nose shortened and a mole removed some two years after the killings.

### c. Hair evidence

The defense introduced into evidence two long hair strands that were "stuck" to Jory's bloody hands when the police processed the crime scene. Los Angeles Police Department Criminalist Doreen Music testified that, in 1983, she had microscopically examined the two hairs and concluded that the hair strands were dissimilar to strands of defendant's hair, taken from his hairbrush. She did not attempt to match the hairs with hairs from Connie, Jory, or David Navarro. She testified that although the length and color of David's hair at the time of the killings may have been consistent with the hairs found on Jory's hands, she did not perform a match test. She added that David's hair would have changed in the last 11 years between the killings and the time of trial, rendering any new match testing unreliable. Music believed the hairs found in Jory's hands were consistent

17

with "shed hairs" and that it was possible that a bloody hand wiped across the carpet could have picked up the hair strands.

## B. Penalty Phase

### 1. Prosecution's case

Christianne "Christy" Jory, the daughter of Sue Jory, was 13 years of age when her mother was killed. Christy testified that she thought of Connie Navarro, her mother's best friend and her godmother, as a second mother to whom she affectionately referred as "Aunt Connie." Christy had hoped that, if anything happened to her mother, she would live with Connie and her son, David, because the two of them were family to her. She felt that she had lost her family on the day that her mother and Connie were taken from her. In the immediate aftermath of the killings, Christy wrote a letter to defendant, in which she asked him how he could be "so selfish to think he had the right to fuck up everybody's life like this." Thereafter, she went through therapy for six years and was forced to live with her father. Because of a "difficult" and "horrible" relationship with her stepmother, Christy spent the four years following her mother's death "locked . . . in [her] room."

David Navarro, who was 15 years of age when his mother was killed, testified that the event "destroyed [his] life." Because his father was so devastated by Connie's death, David took care of his father, who was a "wreck" after her loss. David himself became suicidal, and his father was unable to care for him. He began to use marijuana and eventually graduated to heroin, which he used daily for many years. He underwent constant therapy for much of his adult life and was hospitalized seven times in rehabilitation facilities because of his drug addiction. David testified that since the murders, he has always been afraid of defendant and often has nightmares about him. He feared defendant would return to kill him and

18

his father. David also blamed his mother's death on himself because he failed to discuss the incident in which defendant broke into their home and handcuffed him to the toilet. He stated that he wished defendant had killed him instead of his mother.

### 2. *Defense case*

Liz Brooks had sustained a friendship with defendant for nearly 15 years. She described defendant as very considerate, respectful, and helpful. Brooks also knew Connie Navarro and she and her husband would often socialize with them, including going out to dinner together on occasion. According to Brooks, it appeared that defendant loved both Connie and her son. She testified that David and defendant were very close — like father and son — and that, when defendant and Connie broke up, defendant was upset and became depressed. But according to Brooks, despite being depressed and wanting to reconcile, defendant eventually began to come to terms with the breakup. In the time since defendant's incarceration, Brooks has kept in regular contact with him by phone and considers him to be a very close friend.

Henry Kaney, an associate pastor at Hope Chapel, in Hermosa Beach, met defendant in the late 1970's. They developed a close friendship. Kaney stated that there was a time when Connie and defendant were very happy and in love. Eventually, trouble emerged in the relationship, and it appeared to be ending. Kaney and his wife suggested to defendant that he leave Connie alone and place some distance between the two of them. He described defendant dramatically losing 20 to 30 pounds during this period. Additionally, defendant became despondent, resistant, and suicidal — all of which were out of character for defendant according to Kaney. Kaney testified that he maintains contact with

19

defendant, mostly by telephone. He asked the jury to show mercy toward his "brother," whom, he said, he loves.

## II. PRETRIAL ISSUES

### A. Dismissal of Jurors for Cause

Defendant contends the trial court erred by dismissing, over his objection, four prospective jurors based solely on their responses concerning the death penalty in their written questionnaires. We conclude that the trial court erred by failing to conduct voir dire with respect to one prospective juror, whose written questionnaire reflected conflicting and uncertain views concerning the death penalty and her ability to serve. Although this error did not result in the seating of an unqualified juror, it requires automatic reversal of defendant's sentence of death under existing United States Supreme Court precedent. (*Gray v. Mississippi* (1987) 481 U.S. 648, 659-667 (*Gray*) (opn. of the court); *id.*, at pp. 667-668 (plur. opn.); *id.*, at p. 672 (conc. opn. of Powell, J.).)

#### 1. *The standard of review*

Under decisions of the United States Supreme Court, prospective jurors who express personal opposition to the death penalty are not automatically subject to excusal for cause as long as "they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." (*Lockhart v. McCree* (1986) 476 U.S. 162, 176; see also *Witherspoon v. Illinois* (1968) 391 U.S. 510, 522 (*Witherspoon*).) To determine if a prospective juror is excusable for cause without compromising a defendant's constitutional rights, we inquire whether the prospective juror's views on the death penalty "would 'prevent or substantially impair the performance' " of the juror's duties in accordance with the court's instructions and his or her oath. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*).) But "this standard . . . does not require that a juror's bias be proved

20

with 'unmistakable clarity,' " because the questioning of prospective jurors may not always render their bias " 'unmistakably clear.' " (*Id*. at pp. 424, 425.)  Often, prospective jurors "may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." (*Id.* at p. 425.)

The excusals at issue here were based solely on the prospective jurors' responses to the written questionnaire.  We have held that "when an excusal was based on questionnaire responses alone, the excusal may be upheld if those answers, 'taken together,' clearly demonstrate the juror's unwillingness or inability, because of attitudes about the death penalty, to perform his or her duties in a capital trial." (*People v. McKinnon* (2011) 52 Cal.4th 610, 647, quoting *People v. Avila* (2006) 38 Cal.4th 491, 533.)  In reviewing dismissals for cause based upon only written answers, we apply a de novo standard of review.  (*People v. McKinnon, supra,* at p. 647.)

### 2. *The questionnaire used below was not flawed*

Defendant rests his challenge on *People v. Stewart* (2004) 33 Cal.4th 425 (*Stewart*), in which the trial court excused five prospective jurors for cause based solely on their written answers to a single, multipart question concerning their views on the death penalty.  We concluded the information elicited by the question, standing alone, was insufficient for determining bias under the *Witt* standard because the preface to the question asked the prospective juror whether he or she held " 'a conscientious opinion or belief about the death penalty which would prevent *or make it very difficult* for' " the prospective juror to find the defendant guilty of first degree murder, find a special circumstance to be true, or vote to impose the death penalty. (*People v. Stewart*, *supra*, at p. 442, italics added.)  We concluded that the use of the "make it very difficult" language in the

21

preface to the question made it impossible to determine whether the prospective jurors' subsequent "yes" or "no" answers revealed that their personal views would have actually prevented or substantially impaired the performance of their duties as jurors under the *Witt* standard. "In other words, the question as phrased in the juror questionnaire did not directly address the pertinent constitutional issue. A juror might find it very difficult to vote to impose *the death penalty*, and yet such a juror's performance still would not be substantially impaired under *Witt*, unless he or she were unwilling or unable to follow the trial court's instructions by weighing the aggravating and mitigating circumstances of the case and determining whether death is the appropriate penalty under the law." (*Stewart*, *supra*, at p. 447; see also *People v. Avila*, *supra*, 38 Cal.4th at p. 530 ["we stressed a material flaw in the *Stewart* questionnaire itself"].) We concluded, therefore, that the trial court erred in excusing five prospective jurors for cause based only on their answers to this problematic question and without further inquiry.

The questions utilized in the present case do not suffer from the defect present in *Stewart*. The questionnaire form employed here posed 14 questions, some containing subparts, that probed several aspects of the prospective jurors' views on the death penalty. The two questions most directly relevant to the *Witt* standard were death penalty questions No. 65 and No. 68. Question No. 65 asked: "Could you set aside your own personal feelings regarding what the law ought to be and follow the law as the court explains it to you?" The questionnaire form specifically called for a "yes" or "no" answer to this question. Question No. 68 asked: "Do you have such an opinion concerning the death penalty that, regardless of the evidence that might be developed during the penalty phase of the trial . . . you would automatically and absolutely refuse to vote for the death penalty in any case?" This question did not call for any specific response and was followed by a blank that the prospective juror could use to answer. Unlike the

22

questions posed in *Stewart*, these two questions, by themselves, were "sufficiently clear" such that a "yes" or "no" answer to each of them would " 'leave no doubt' " as to whether a prospective juror was "willing or able to set aside his or her personal views and follow the law." (*People v. Wilson* (2008) 44 Cal.4th 758, 787, 790.)

### 3. *The trial court properly dismissed three of four prospective jurors based on only their written responses*

Defendant maintains the same objections he raised below — that the written responses of four prospective jurors to the *entire* questionnaire, not only questions No. 65 and No. 68, raised sufficient ambiguity to require further examination by the court or counsel to determine whether they should be excused for cause based upon their reservations concerning the death penalty. We conclude that the trial court erred by excusing one of these four prospective jurors for cause without personally examining her.

The four prospective jurors that the trial court excused over defendant's objection are A.K., N.K., E.H., and J.F.

Prospective Jurors E.H. and J.F. wrote "yes" in response to question No. 68, which asked whether the prospective juror would automatically and absolutely refuse to vote for the death penalty in any case. Given that question No. 68 was phrased unequivocally, a prospective juror's decision to write "yes" as an answer clearly established that the prospective juror held a bias against the death penalty that "would 'prevent or substantially impair' " the performance of his or her duties as a juror even if the evidence leaned in favor of imposing death. (*Witt*, *supra*, 469 U.S. at p. 424.) In addition, E.H. and J.F. both checked "no" in response to question No. 65, indicating that they could not "set aside" their "own personal feelings regarding what the law ought to be and follow the law . . . ." Although question No. 65, as presented on the questionnaire form, called for only

23

a "yes" or "no" answer, Prospective Juror E.H. further wrote, "no, not if it includes the death penalty."

Prospective Jurors E.H. and J.F. also made clear that they opposed capital punishment in answering other death-penalty-related questions.[11] When asked to describe her "general feelings regarding the death penalty" in question No. 57, E.H. wrote her belief that "it is wrong to take a life for any reason, the chance of error is too great," and she also expressed her thought that the penalty was imposed too randomly. Similarly, in describing her "general feelings regarding the death penalty," J.F. wrote that the government "should not have the right to execute a citizen" because of the possibility of innocence. (Original underscoring.) When expressing her feelings about the frequency with which the death penalty is used, J.F. wrote, "I feel uncomfortable whenever it is used." Although in other death-penalty-related questions, E.H. and J.F. both wrote that they would consider all the evidence before deciding whether the death penalty

---

[11] In *Stewart*, we refused to use the prospective juror's other statements in the questionnaire expressing general opposition to the death penalty as evidence that could correct the original defective death penalty question. In those circumstances, general opposition to the death penalty did not, without more, immediately establish that the prospective juror also was unwilling to set aside those sentiments and follow the law. (*Stewart*, *supra*, 33 Cal.4th at pp. 448-449.) In subsequent cases, however, we have relied on the prospective juror's other statements in the questionnaire expressing general opposition to the death penalty. (*People v. Russell* (2010) 50 Cal.4th 1228, 1262-1263; *People v. Avila*, *supra*, 38 Cal.4th at pp. 531-533.) It was proper to do so in those subsequent cases because we determined that the questions were not defective, and evidence of each prospective juror's opposition to the death penalty rebutted each defendant's argument that, notwithstanding the answers, these prospective jurors should have been questioned further. The same is true here. The statements of A.K., E.H., and J.F. in opposition to the death penalty merely reinforce that their clear answers to either question No. 65 or No. 68 made them excusable under the *Witt* standard.

24

was appropriate, and E.H. wrote that her views on the death penalty would not automatically cause her to refuse find a defendant guilty of murder or to find true a special circumstance allegation, their answers to these questions did not indicate that they could actually *impose* a verdict of death. Based on their answers to questions No. 65 and No. 68, E.H. and J.F. clearly could not do so, and they were properly excused as a result.

Like Prospective Jurors J.F. and E.H., Prospective Juror A.K. wrote "yes" in response to question No. 68, meaning that he would automatically and absolutely refuse to vote for the death penalty in any case. Although he wrote "yes" in response to question No. 65, indicating that he could "set aside" his "own personal feelings regarding what the law ought to be and follow the law," as to question No. 66, which asked whether his opposition to the death penalty would cause him to "refuse to vote" for a verdict of murder in the first degree even if the prosecution proved guilt beyond a reasonable doubt, A.K. wrote "yes." In describing his feelings about the death penalty, A.K. wrote "I desagri [*sic*]." He wrote that he believed the death penalty was used too often. Again, his answers to this question clearly indicated that A.K.'s personal views about the death penalty "would 'prevent or substantially impair' " performance of his duties as a juror even in the face of what the law required. (*Witt*, *supra*, 469 U.S. at p. 424.)

Unlike the three previously described prospective jurors, however, N.K. expressed her support for the death penalty, writing that she favored the reinstatement of capital punishment in California. She believed the death penalty "is not used enough" and observed that the sentence is not carried out "for many years later." N.K. also wrote "no" in response to question No. 68, indicating that she would not automatically and absolutely refuse to vote for the death penalty in any case.

25

But Prospective Juror N.K.'s other responses were inconsistent with her expressed support of the death penalty and her ability to set aside her views. When asked in question No. 66 whether she would refuse to vote in favor of defendant's guilt of murder in the first degree, even if it were proved beyond a reasonable doubt, because she *opposes* the death penalty and would not want the jury to have to consider the death penalty, N.K. responded "yes." N.K. checked "no" in response to question No. 65, indicating that she could not "set aside" her "own personal feelings regarding what the law ought to be and follow the law . . . ." As to question No. 71, which asked whether the prospective juror had any views that might affect the prospective juror's ability to be fair and impartial or cause her to be unable to serve as a juror, she answered "yes." N.K. further explained, "I'm afraid I could not feel right in imposing the death penalty on someone even though I feel it is nessasary [*sic*] under some circumstances."

In light of N.K.'s other answers expressing her support for the death penalty, her inconsistent answers are susceptible of two interpretations — either she, like other jurors not disqualifiable under *Witherspoon-Witt*, feared that actually being on a death jury would be difficult or uncomfortable, or she was advising the court that she could not impose a decision of death, even if the evidence warranted its application. From the questionnaire alone, we cannot possibly determine which scenario prompted her answers. Under these circumstances, N.K.'s answers did not clearly reveal that she was unable to impose the death penalty, thereby preventing her from performing her duties as a juror.

Accordingly, we conclude the trial court erred by failing to question Prospective Juror N.K. in open court to determine whether she was excusable as someone who could not face of the enormity of the task of judging life or death.

26

### 4. *Reversible error*

The general rule is that, absent a showing of prejudice, an erroneous excusal of a prospective juror for cause does not mandate the reversal of judgment. This rule is based on the principle that a "[d]efendant has a right to jurors who are qualified and competent, not to any particular juror." (*People v. Holt* (1997) 15 Cal.4th 619, 656.) But as previously noted, under existing United States Supreme Court precedent, the erroneous excusal of a prospective juror for cause based on that person's views concerning the death penalty *automatically* compels the reversal of the penalty phase without any inquiry as to whether the error actually prejudiced defendant's penalty determination. (*Gray*, *supra*, 481 U.S. at pp. 659-667 (opn. of the court); *id*., at pp. 667-668 (plur. opn. of Blackmun, J.); *id*., at p. 672 (conc. opn. of Powell, J.).)

Under compulsion of *Gray*, we reverse defendant's penalty phase verdict.

## B. Asserted Errors During Jury Selection

Despite our reversal of the penalty phase verdict, we will address defendant's other claims of error during jury selection to the extent that they may also implicate the validity of his guilt phase verdict. Defendant claims the trial court committed error under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) by finding no prima facie case of discrimination based on the prosecutor's use of peremptory challenges to remove a total of six African-American prospective jurors.[12] He alleges the trial

---

[12] Although defendant based his objections only on *Wheeler*, we conclude his objections were sufficient to allow him to argue on appeal error under both *Batson* and *Wheeler* because a motion under either raises the same factual inquiries and application of the same legal standards. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.)

court's finding violated his state constitutional right to a trial by a jury drawn from a representative cross-section of the community, and that this assertedly biased selection of jurors violated his Sixth Amendment right to an impartial jury and his Fourteenth Amendment right to equal protection under the federal Constitution. We conclude the trial court properly denied defendant's objection to these peremptory challenges.

### 1. *Background*

Defendant is Caucasian, as were the victims. One of defendant's defense attorneys, Carl Jones, was African-American.

After an initial screening of prospective jurors based on hardships and their answers to the jury questionnaire, the trial court began general voir dire of the remaining prospective jurors. The court randomly called a group of 23 prospective jurors into the jury box and examined them individually and as a group. After addressing the first 23 prospective jurors, the court resolved excusals for cause, and then allowed each party in turn to use a peremptory challenge against only the first 12 seated prospective jurors. If a party exercised a challenge against one of the first 12 prospective jurors, the next-numbered prospective juror from seats 13 through 23 would replace that challenged prospective juror. The parties continued to exercise their peremptory challenges until only 12 prospective jurors remained from the first group of 23. At that point, the court randomly called another group of 11 prospective jurors to repopulate seats 13 through 23, and another round of questioning would begin again. After four such rounds, each party exhausted its 20 peremptory challenges and the court swore in the first 12 jurors.

At the beginning of the first round, of the first 12 seats, three were occupied by African-Americans, C.B., E.C., and E.G. Near the end of the first round, each

28

side used four peremptory challenges, and one of the prosecutor's peremptory challenges included E.C. At this point, the prosecutor accepted the panel, which still included three African-Americans, C.B., E.G., and newly added Prospective Juror D.P. The defense did not accept the panel and exercised another peremptory challenge against a prospective juror, who was then replaced by D.H., another African-American. The prosecutor then used his fifth peremptory challenge to remove D.H. D.H. was then replaced by M.F., another African-American. After the defense used its sixth peremptory challenge, the court stopped the challenges and began the second round by calling another group of 11 prospective jurors to fill seats 13 through 23. At the beginning of the second round, the first 12 prospective jurors included four African-Americans, C.B., D.P., E.G., and M.F.

Near the end of the second round, the prosecutor exercised his sixth peremptory challenge against M.F., and the defense responded with its first *Wheeler* motion. Defense counsel pointed out that the prosecutor had used three of his challenges against African-American jurors, and claimed that there was a prima facie showing of discrimination based on race, because Prospective Jurors D.H. and M.F. were "ideal prosecution jurors were they not Black." Before the trial court ruled on whether there had been a prima facie showing, the prosecutor claimed that he challenged D.H. and M.F. because "they were bad on death." The court agreed with the prosecutor's assessment and denied defense counsel's motion.

After the defense exercised its seventh peremptory challenge, the prosecutor accepted the panel, which then contained three African-American Prospective Jurors C.B., D.P., and E.G. The defense did not accept the panel, and the parties continued to exercise their peremptory challenges. The prosecutor used his ninth peremptory challenge against D.P., and the defense made a second *Wheeler* motion. Defense counsel stated that there was nothing about D.P.'s

29

answers besides "her skin color that would lead her to being challenged." The prosecutor interjected, "[o]ther than the fact that she was arrested," and the trial court denied the motion. After the defense exercised another peremptory challenge, the prosecutor accepted the panel for a third time, which then contained two African-Americans, Prospective Jurors C.B. and E.G. The defense did not accept the panel, and the parties continued to exercise their peremptory challenges until the end of the second round.

Near the end of the third round, after using his 11th peremptory challenge, the prosecutor accepted the panel for a fourth time, at which point the panel still contained two African-Americans, Prospective Jurors C.B. and E.G. The defense did not accept the panel, and the prosecutor's next peremptory challenge brought a third African-American, Prospective Juror R.B., into the first 12 seats. The prosecutor then used his 13th peremptory challenge to remove C.B. After the defense exercised another peremptory challenge, the prosecutor accepted the panel for a fifth time, at which point the panel contained two African-Americans, Prospective Jurors R.B. and E.G. The defense did not accept the panel, and the parties continued to exercise their peremptory challenges.

At the end of the third round, the defense made its third *Wheeler* motion, claiming that the removal of C.B., despite being accepted on the jury panel by the prosecutor previously, and the removal of the other African-American prospective jurors, revealed a "prima facie case as to the systematic exclusion of minorities." Defense counsel stated that none of C.B.'s answers justified her removal, and the prosecutor did not offer a reason for her removal at that time. The trial court denied defendant's motion.

Near the end of the fourth round, the defense exhausted its peremptory challenges, but the prosecution had five remaining. The prosecutor's next peremptory challenge brought a third African-American, Prospective Juror D.M.,

30

into the first 12 seats. The prosecutor then used his 17th peremptory challenge to remove D.M. After the prosecutor exhausted his last three peremptory challenges, the court empanelled the 12 remaining jurors.

After selection of the four alternate jurors,[13] the defense made its fourth *Wheeler* motion, claiming that there was no good cause to remove D.M. and that there was a prima facie showing of bias because none of D.M.'s answers "were out of the ordinary." Although the trial court denied the motion, the prosecutor explained that he was uncomfortable with D.M.'s responses concerning the relevance of evidence of flight and he "didn't like his earring." As for the other African-American prospective jurors he challenged, the prosecutor stated he made his challenges based on their ability to decide the death penalty and whether "they or someone close to them had some type of record." Defense counsel responded that there was a seated Caucasian juror who had an earring and other seated Caucasian jurors with arrest records. The prosecutor replied, "What about little earring versus big earring?"

The 12-person jury consisted of two African-American Jurors, R.B. and E.G., one Hispanic juror, eight Caucasian jurors, and one juror who declined to state her race on the jury questionnaire. In all, 57 prospective jurors were subjected to voir dire to select the first 12 jurors.

## 2. *Applicable law*

Procedures governing motions alleging the discriminatory use of peremptory challenges are settled. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an

---

[13] One of the alternate jurors, G.S., was African-American.

31

inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.)

Here, in three of the four *Wheeler* motions, before the trial court explicitly addressed whether a prima facie showing of discriminatory purpose had been made, the prosecutor explicitly volunteered his actual reasons for the contested peremptory challenges. As to one *Wheeler* motion, the court simply denied it without the prosecutor immediately offering a race-neutral reason for the excusal, but, as we will explain, the prosecutor did eventually supply a reason, in response to defendant's last *Wheeler* motion. Moreover, in denying defendant's first *Wheeler* motion, the court expressly agreed with the prosecutor's reasons, and thereafter appeared implicitly to agree with the prosecutor's reasons given in response to defendant's subsequent *Wheeler* motions. We have characterized such a circumstance as a "first stage/third stage *Batson* hybrid," which renders " 'moot' " whether defendant established a prima facie showing of a discriminatory purpose. (*People v. Mills* (2010) 48 Cal.4th 158, 174 (*Mills*), quoting *People v. Lenix* (2008) 44 Cal.4th 602, 613, fn. 8 (*Lenix*).) "Accordingly, we express no opinion on whether defense counsel established a prima facie case of discrimination and instead skip to *Batson*'s third stage to evaluate the prosecutor's reasons for dismissing [the] African-American prospective jurors." (*Mills, supra,* at p. 174; see also *People v. Booker* (2011) 51 Cal.4th 141, 165.)

"[T]he critical question in determining whether a prisoner has proved purposeful discrimination" at a third-stage inquiry "is the persuasiveness of the

32

prosecutor's justification for his peremptory strike.  At this stage, 'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.' [Citation.]  In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 338-339 (*Miller-El I*), quoting *Purkett v. Elem* (1995) 514 U.S. 765, 768.)  " 'In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.  There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.  As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province." ' " (*Miller-El I*, *supra*, at p. 339, quoting *Witt*, *supra*, 469 U.S. at p. 428.)

Accordingly, because the trial court is "well positioned" to ascertain the credibility of the prosecutor's explanations and a reviewing court only has transcripts at its disposal, on appeal " 'the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal' and will not be overturned unless clearly erroneous." (*Miller-El I*, *supra*, 537 U.S. at pp. 339, 340, quoting *Hernandez v. New York* (1991) 500 U.S. 352, 364.)

Finally, given that we are engaging in a third-stage inquiry, we will examine defendant's claim that a comparative juror analysis shows that the prosecutor's stated reasons for striking the African-American prospective jurors were pretextual because non-African-American prospective jurors were not

33

challenged for similar reasons. (*Lenix*, *supra*, 44 Cal.4th at p. 622.) Defendant summarily raised such comparisons at the trial court, and we will consider additional comparisons he raises for the first time on appeal because, if the record permits such comparisons, they can provide useful " 'circumstantial evidence' " in determining "the legitimacy of a party's explanation for exercising a peremptory challenge." (*Mills*, *supra*, 48 Cal.4th at p. 177, quoting *Lenix*, *supra*, at p. 627.) Nevertheless, " 'we are mindful that comparative juror analysis on a cold appellate record has inherent limitations.' [Citation.] In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved. 'Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding.' " (*People v. Taylor* (2009) 47 Cal.4th 850, 887, quoting *Lenix*, *supra*, at pp. 622, 624.)

With the foregoing principles in mind, we now discuss each of the six peremptory challenges at issue.

### 3. *The prosecutor had valid neutral reasons for removing Prospective Jurors D.H., M.F., and C.B.*

The prosecutor claimed he challenged D.H. and M.F. because "they were bad on death," an assertion with which the trial court agreed. The prosecutor struck each of these two prospective jurors at the first opportunity to do so, and the prosecutor's actions appear genuinely related to their equivocations regarding the death penalty. (See *People v. Smith* (2005) 35 Cal.4th 334, 347-348 [a prospective juror's doubts about the death penalty can be a legitimate, race-neutral reason to

34

exercise a peremptory challenge].)  In particular, the record reveals that the prosecutor carefully questioned both of these prospective jurors on this exact subject.

Prospective Juror M.F., on both his questionnaire and during voir dire, explained that he "really" did not "like" the death penalty or seeing "people get put to death."  Similarly, Prospective Juror D.H. during voir dire expressed agreement with M.F.'s opinion, stating that she did not "want to see anyone die" and that she would prefer life imprisonment.  D.H. also claimed that life imprisonment was a greater punishment than death because that would force murderers "to think about what they did for the rest of their lives."  Finally, in her questionnaire, D.H. stated her belief that the death penalty was imposed "randomly."  Although both M.F. and D.H. indicated they could set aside their inclinations and follow the law if it led to the imposition of the death penalty, their initial impressions leaned against its imposition.  Under the circumstances, the record amply supports any doubts the prosecutor had regarding these two prospective jurors.

The reason the prosecutor struck Prospective Juror C.B. is less clear from the record, given that the prosecutor did not specifically isolate the reason for his peremptory challenge of her.  In response to defendant's last *Wheeler* motion, however, the prosecutor did state that all of his peremptory challenges were based on either the prospective jurors' ability to decide the death penalty or whether the prospective jurors or "someone close to them had some type of record."  Because Prospective Juror C.B. did not disclose the existence of any prior arrests of herself or someone close to her, it is logical to conclude that the prosecutor peremptorily challenged C.B. based on her death penalty views, and defendant does not argue otherwise.

The record substantially supports the prosecutor's claim that he dismissed C.B. due to her doubts about the death penalty. C.B. stated on her questionnaire that "I do not believe death penalty [*sic*] is a punishment. The person is put to death and not to punishment [*sic*] to me." The prosecutor attempted to obtain clarification of her views during voir dire, but received confusing responses. Nonetheless, the prosecutor accepted the jury panel, with C.B. seated in it, a total of four times. It appears that the prosecutor decided to remove C.B. at the end of the third round when presented with the opportunity to replace her with Prospective Juror K.G., whose questionnaire expressed neutral feelings regarding the death penalty: "The laws regarding the death penalty are on the books and they should be enforced if the situation merits it." In addition, K.G. remarked that the prosecutor "wouldn't have brought the case to trial if he did not think that he could prove guilt." These circumstances establish that the prosecutor had a valid neutral reason for removing Prospective Juror C.B. at the time that he did so — he had an opportunity to replace her with a favorable juror who was less equivocal about the death penalty. The belief that Prospective Juror K.G. leaned in favor of the prosecution likely was shared by the defense as well — defense counsel immediately exercised their next available peremptory challenge to strike K.G.

As the trial court concluded, it appears the prosecutor had plausible reasons for removing Prospective Juror C.B.

### 4. *A comparative analysis of prospective jurors and their views on the death penalty reflects no disparate treatment based on race*

Defendant argues that a comparative juror analysis indicates that D.H.'s, M.F.'s, and C.B.'s views concerning the death penalty were a pretextual reason for their removal because the prosecutor allegedly failed to show equal concern with several Caucasian prospective jurors who had expressed similar views. We disagree.

36

Defendant identifies three empanelled jurors, J.S., M.G., and T.H., and three Prospective Jurors M.S., V.N., and S.H. as Caucasians relevant to his comparative analysis. With one exception, none of defendant's comparisons support his claims.

Defendant acknowledges that two of the Prospective Jurors, M.S. and V.N., had expressed considerable reluctance regarding the death penalty and that the prosecutor eventually exercised his peremptory challenges to strike each of them.[14] Defendant deems M.S. and V.N. nonetheless relevant to a comparative analysis because, unlike African-American Prospective Jurors D.H. and M.F., the prosecutor did not *immediately* exercise his peremptory challenges to strike them — in fact, he accepted the jury panel with M.S. on it twice, and he accepted a jury panel with V.N. on it once before excusing each of them. Defendant argues that the willingness of the prosecutor to accept these two Caucasian prospective jurors, compared with his immediate excusal of the two African-American prospective jurors, reveals that a prospective juror's opinions concerning the death penalty were not essential to the prosecutor's decisions to exercise peremptory challenges — but that race was.

---

[14] M.S. wrote in his questionnaire that it was against his ethics to kill anyone "legal or otherwise," that he found the death penalty to be "repugnant," and that he would support its application in only "a horrific and extraordinary" crime. On questioning by the prosecutor during voir dire, he reiterated these concerns but, like D.H., M.F., and C.B., stated he would follow the law and impose the death penalty if appropriate. V.N., in her questionnaire, expressed support for the death penalty in principle, but believed it was imposed "randomly" and "not fairly." She wrote that she could impose the death penalty if appropriate, but expressed during voir dire considerable doubt as to whether she could ever actually vote to impose the death penalty. The prosecutor exercised his seventh and 16th peremptory challenges to strike M.S. and V.N., respectively.

As explained below, when all circumstances are considered, the fact that the prosecutor first accepted the panel with two Caucasian prospective jurors who had reservations regarding the death penalty before excusing them has little relevance to the question of whether the peremptory challenges against D.H. and M.F. were pretextual and race based.

### 5. *Voir dire use and timing of peremptory challenges are subjects of trial strategy*

The record demonstrates that it is likely the prosecutor assumed that the defense had its own reservations concerning Prospective Jurors M.S. and V.N. and would excuse them. Consequently, it would not have been unreasonable for the prosecutor to have accepted these two prospective jurors before the defense exhausted its peremptory challenges in an effort to conserve his own peremptory challenges for their maximum usefulness.

First, when the prosecutor accepted Caucasian Prospective Jurors M.S. and V.N. on the panel, the defense had a number of peremptory challenges remaining to be exercised. On the two occasions the prosecutor accepted M.S. on the jury panel, during the first and second rounds of jury selection, the defense had 16 and 13 peremptory challenges remaining, respectively. On the one occasion when the prosecutor accepted V.N. on the jury panel, during the third round of jury selection, the defense had three peremptory challenges remaining. V.N. had been added to the panel late in the third round, and the prosecutor exercised his next peremptory challenge against her as soon as defendant exhausted his peremptory challenges. If the prosecutor believed the defense would exercise its peremptory challenges against Prospective Jurors M.S. and V.N., then his acceptance of the panel prior to that event carried little risk to the prosecution that previously "accepted" panels — which included M.S. and V.N. — would constitute the actual jury.

Second, Prospective Jurors M.S. and V.N. both had been prior victims of property crime and stated that they had taken steps to protect themselves from crime by installing new locks on their doors. This case involved allegations that defendant repeatedly entered the victim's home surreptitiously and without her consent, contained a special circumstance of burglary, considerable evidence of defendant's skills as a burglar, and a victim who also changed her locks in fear. Thus, it would have been reasonable for the prosecutor to believe that the defense might hesitate in having these prospective jurors judge defendant's guilt.

These circumstances suggest that the defense would use its peremptory challenges against Prospective Jurors M.S. and V.N., and that the prosecutor could reasonably assume that he did not need to waste his peremptory challenges on these two prospective jurors but, instead, could conserve his challenges so as to maximize their effectiveness. Yet the record suggests that when the prosecutor's expectation did not come to pass, because the defense did not remove these two prospective jurors, the prosecutor elected to use his own peremptory challenges to remove them because of their views on the death penalty. Given that there appears to be a legitimate explanation for why the prosecutor did not immediately challenge Prospective Jurors M.S. and V.N., the prosecutor's mere delay in dismissing them does not provide reliable " 'circumstantial evidence' " in determining "the legitimacy of a party's explanation for exercising a peremptory challenge." (*Mills*, *supra*, 48 Cal.4th at p. 177, quoting *Lenix*, *supra*, 44 Cal.4th at pp. 627, 626.)

Defendant claims seated Jurors M.G. and T.H., too, were Caucasians who expressed reservations about the death penalty, but the record does not support his assertion. When asked in his questionnaire about his general feelings regarding the death penalty, M.G. wrote "marginally effective — to be used only if rehabilitation is not possible." Although the prosecutor did not question M.G.

39

about this specific statement, M.G. expressed no hesitation about being able to sit and judge whether defendant deserved a death sentence. M.G., unlike D.H., M.F., M.S., and V.N., specifically affirmed that he would be able to consider mitigating and aggravating evidence to determine the proper penalty. Similarly, T.H. expressed no hesitation concerning his ability to judge defendant's penalty. To the contrary, T.H. wrote in his questionnaire that he believed in an "an eye for an eye" because "a cold-blooded killer will not mix in society."

Defendant also complains that the prosecutor failed to examine Caucasian Prospective Juror S.H. for her views on the death penalty "even though she left all the death penalty questions blank on her juror questionnaire." The record reflects, however, that she left blank only three of the 15 questions concerning the death penalty. The three questions concerned her general feelings regarding the death penalty; whether she believed the penalty was used too often, too seldom, or randomly; and whether the state should impose the death penalty for killing another person, intentionally or not. In S.H.'s answer to the other 12 death penalty questions, she expressed no hesitation with respect to her ability to judge penalty, review the relevant penalty evidence, and follow the applicable law in the penalty phase. Moreover, it is clear why the prosecution did not specifically ask S.H. about the questions she left blank — she had indicated in her questionnaire that she did not trust lawyers "or our judicial system." Both the prosecutor and defense counsel spent most of their questioning of S.H. on this subject, and she revealed that she did not like lawyers because of how they question witnesses, and she did not trust the memories of witnesses for events that happened long ago. Given that defendant was being tried for killings that had occurred 11 years earlier, her answers were arguably detrimental to both sides, but the defense exercised a peremptory challenge against S.H. first during the selection of alternate jurors. Here, the record suggests the parties were more concerned about

40

S.H.'s views on lawyers and the justice system than her views on the death penalty.

Lastly, we review the record as to Juror J.S. Our comparative analysis indicates that the prosecutor's challenges to Caucasian prospective jurors who expressed reservations concerning the death penalty did not extend to J.S. In his questionnaire, Caucasian Prospective Juror J.S. wrote he did not "like" the death penalty "because it is irrevocable in the case of a mistake" and expressed his feeling that it is "barbaric." He also wrote that he might automatically refuse to vote for a death sentence or to find true special circumstances because of his views. During voir dire, J.S. stated he had modified his views somewhat and would try to follow the law, but reiterated that he believed "a civilized society" should not have the death penalty. J.S. further explained he was unsure whether he could return a death verdict if the evidence warranted it. After the removal of Prospective Juror S.H., J.S. entered the jury box as an alternate. Despite the fact the prosecutor had three peremptory challenges remaining, he exercised no challenge against J.S., who eventually became empanelled as the second alternate juror. As defendant points out, if the prosecutor had exercised one of his remaining peremptory challenges against J.S., the next prospective juror in line to replace him had much more favorable views on the death penalty and was the daughter of a police detective. We find no constitutional violation.

The fact that defendant has identified a single aberration in the prosecutor's strategy fails to establish a pretextual removal of African-American Prospective Jurors D.H., M.F., and C.B. On the contrary, a comparative analysis here reveals the obvious — the prosecutor of a death penalty case would be reluctant to keep any prospective juror who expresses some hesitation about being able to return a death verdict in an appropriate case. Accordingly, the prosecutor's explanations for challenging Prospective Jurors D.H., M.F., and C.B., and the trial court's

41

explicit and implicit credibility determinations surrounding those explanations, is supported by substantial evidence and thus entitled to deference. (*Lenix*, *supra*, 44 Cal.4th at pp. 613-614.)

### 6. *Prospective Juror D.M.'s view's concerning evidence of flight was a valid neutral reason for his dismissal*

The prosecutor claimed as his reasons for dismissing African-American Prospective Juror D.M.: (1) his answers concerning the relevance of a defendant's flight from the scene of the crime, and (2) his "big" earring. We conclude the record amply supports the prosecutor's explanation for excusing D.M. due to his statements regarding flight.

During voir dire, defense counsel asked D.M. whether he would automatically conclude defendant was guilty by virtue of the mere fact that there was evidence he had fled the scene. D.M. replied, "That doesn't prove anything" and that such evidence would not affect him "in any kind of way." Defense counsel then asked whether D.M. "[w]ould base the burden [of proof] solely on one issue without considering all the other evidence in the case or would you consider all the evidence?" D.M. said he would consider "all the evidence," but again voluntarily reiterated that evidence of defendant's flight would be irrelevant to him, stating, "That's got nothing to do with anything." He further explained, "I'm not going to look at the individual and say, well, yeah, he tried to flee . . . that wouldn't be right . . . [or] fair to him."

The prosecutor asked for a sidebar and argued that defense counsel had misstated the law concerning evidence of flight. Defense counsel disagreed and explained that he was merely asking Prospective Juror D.M. whether he was going to consider only evidence of flight or "all the evidence he hears." Defense counsel also pointed out that he had already explained the relevance of flight to the prospective jurors during his questioning the prior day, saying that it was one

42

piece of evidence the jurors "may consider" as circumstantial evidence of a defendant's consciousness of guilt.

The trial court resolved this dispute by reading to the prospective jurors CALJIC No. 2.52, the jury instruction explaining the relevance of evidence of flight, and allowing the parties to question Prospective Juror D.M. again on the subject.[15] Upon further questioning by defense counsel regarding whether he would follow the instruction, D.M. said, "Yes, sure, I guess." Later, when questioned by the prosecutor, D.M. said he would "certainly" follow the instruction.

Although Prospective Juror D.M. eventually stated he would consider evidence of flight, it is clear from the record that his initial inclination was to view such evidence as irrelevant. Even when instructed with the applicable law, D.M. responded with some equivocation before clearly affirming that he would follow the instruction. Defendant points to no other prospective juror who expressed any hesitation regarding evidence of flight. Clearly, the prosecutor had ample reason to doubt whether D.M. would properly weigh any evidence of defendant's flight. We conclude the trial court's acceptance of the prosecutor's explanation for challenging D.M. is supported by substantial evidence. (*Lenix*, *supra*, 44 Cal.4th at pp. 613–614.)

---

[15] The trial court told the prospective jurors: "The flight of a person immediately after the commission of a crime is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."

43

*7. The arrest records of Prospective Juror D.P. and of E.C.'s son were valid neutral reasons for their dismissals*

The prosecutor expressly claimed that he exercised a peremptory challenge of Prospective Juror D.P. because of her arrest record. And it appears his reason for dismissing Prospective Juror E.C. was related to her son's arrest record.[16] (*People v. Lomax*, *supra*, 49 Cal.4th at p. 573 ["The arrest of a juror or a close relative is an accepted race-neutral reason for exclusion"].) We conclude the record amply supports the prosecutor's explanation for striking both prospective jurors.

In her questionnaire, D.P. disclosed that she had been arrested in a student protest at California State University, Northridge, 25 years earlier. During voir dire, D.P. explained she was a member of the Black Student Union, and in 1968 or 1969 she and a few hundred other people were arrested for protesting the school's lack of an African-American studies department. She said she was arrested and released. In her questionnaire, E.C. disclosed that her son had been arrested for six counts of assault. During voir dire, E.C. explained that her son's arrest had occurred nine months earlier and that the changes had been recently resolved in juvenile court. Both D.P. and E.C. asserted that their experiences with the criminal justice system would not affect their ability to be fair in the present case.

---

[16] Defendant arguably has forfeited any contention concerning E.C.'s dismissal because there is no indication in the record that defense counsel directed a *Wheeler* motion to her dismissal. (*People v. Lomax* (2010) 49 Cal.4th 530, 570, fn. 13.) E.C. was the first African-American prospective juror removed by the prosecutor, but defense counsel made no specific *Wheeler* motion regarding her removal. Instead, the record shows defense counsel lodged specific *Wheeler* motions only as to the removal of Prospective Jurors C.B., D.H., D.M., D.P., and M.F. Because it appears the prosecutor, nonetheless, offered reasons for E.C.'s dismissal, we address that matter in our analysis.

Defendant does not contend that the arrest of E.C.'s son for six counts of assault was insignificant, but claims that D.P.'s arrest for a student protest was "unremarkable" and appeared to be "far more like a social event than a crime." But it would not be unreasonable for the prosecutor to have been concerned that someone who was willing to be arrested for her views might have firm anti-authoritarian opinions and might also harbor a mistrust of the criminal justice system. The prosecutor reasonably could have believed that D.P. might exhibit bias in the present case.

As the trial court concluded, it appears the prosecutor had plausible reasons for removing Prospective Juror D.P.

### 8. *A comparative analysis of prospective jurors' arrest records or the arrests of their relatives does not reflect disparate treatment*

Defendant argues that a comparative analysis of the arrest records of prospective jurors or their relatives reveals that the prosecution's dismissal of E.C. and D.P. on the grounds described above was pretextual. His argument fails.

Defendant compares arrests described by E.C. and D.P. to the arrests disclosed by several Caucasian prospective jurors and seated jurors and claims they are not so different as to justify singling them out for dismissal. But the arrests described by the two seated Caucasian jurors and one seated Caucasian alternate juror were relatively minor[17] (D.F. [court-martialed in the Army for being "2 days AWOL" in the late 1960's, arrested for driving under the influence (DUI

---

[17] Defendant also claims that a third seated juror, G.B., was a relevant Caucasian juror to compare, but that juror declined to state her race in her questionnaire, and, although she answered "yes" in her questionnaire as to whether she or someone close to her had been arrested, she provided no further detail on the questionnaire and was not asked by either party to elaborate on voir dire.

in 1993), and son arrested for vandalism]; M.Y. [husband accidentally arrested on a warrant for outstanding traffic tickets]; C.K.-B. [son arrested for "unpaid tickets"]).

Defendant also identifies as relevant examples several Caucasian prospective jurors, whom the prosecutor accepted on various panels despite their criminal records. But the prosecutor ultimately challenged all of these jurors and, as explained previously, the circumstance that the prosecutor accepted various panels containing these prospective jurors is meaningless in light of what may have been the prosecutor's apparent deliberate tactic of drawing out and exhausting the defense's peremptory challenges. In any event, the arrests they described were for minor offenses (B.D. [husband arrested for drunkenness]; M.O. [deceased mother had prior arrest records for drunkenness and petty theft]; C.W. [friend arrested for DUI]).

Finally, defendant contends the prosecutor's failure, during the selection of the alternate jurors, to question two Caucasian Prospective Jurors, S.H. and S.P., regarding their relevant arrests, and to remove them, demonstrates that the prosecutor was not genuinely concerned about the criminal justice experience of the prospective jurors. But S.H. merely disclosed that her mother had been arrested for "driving too slow/suspicious behavior," and the parties' questioning of her, as discussed above, focused nearly exclusively on her distrust of lawyers and the justice system. Although S.P. disclosed that he had been arrested for "assault," it is not possible to compare reliably his arrest record with that of E.C. or D.P. because neither party questioned him concerning this arrest. In any event, because these prospective jurors were removed by defense peremptory challenges, it is impossible to conclude that the prosecutor had no concerns about either S.H. or S.P. Given the reasonable tactic of drawing out the defense's peremptory challenges, the prosecutor was reserving his ability to remove certain prospective

46

jurors, and thus we have no idea whether the prosecutor would have kept or challenged S.H. and S.P. in the absence of the peremptory challenges by the defense. (See *Lenix*, *supra*, 44 Cal.4th at p. 631.)

In all, none of the compared jurors or prospective jurors revealed a record comparable to the arrest of E.C.'s son for six counts of assault or the nature of D.P.'s arrest, which suggested she held antiauthoritarian views. The circumstance that the prosecutor may not have extensively questioned other prospective jurors regarding their experiences with the criminal justice system reflects the relatively banal nature of their arrest disclosures.

After examining the record and defendant's numerous arguments, we conclude that substantial evidence supports the trial court's rulings in denying defendant's four *Wheeler* motions. We reject defendant's contention that the trial court "avoided making a sincere effort to evaluate the peremptory challenges." The trial court, in ruling on the defense motions, had the benefit of being able to "place jurors' answers in context and draw meaning from all circumstances, including matters not discernable from the cold record," and our own review of that "cold record" has disclosed no evidence of racial animus. (*Lenix*, *supra*, 44 Cal.4th at p. 626.) The prosecutor's stated reasons for excusing each African-American prospective juror are fully supported, and defendant has failed to demonstrate that those reasons were not genuine.

### III. GUILT PHASE ISSUES

#### A. Admission of Marilyn Young's Statements

Defendant contends the court erred by allowing the prosecution, over defendant's objections, to admit the entire two-hour audio-recorded interview of Marilyn Young by Detective Purcell as a prior consistent statement, following Young's cross-examination. Defendant argues the playing of the *entire* tape

violated Evidence Code sections 791 and 1236, along with his rights to due process and confrontation under the Sixth Amendment to the United States Constitution. We conclude that any error was harmless.

### 1. *Events leading to the admission of the audio recording as a prior consistent statement*

During his cross-examination of Marilyn Young, in order to impeach or clarify her trial testimony, defense counsel referred at least five times to her audio-recorded interview with police, which was conducted on the day after the killings.

Defense counsel made the first two of these references when questioning Young concerning the incident in which defendant allegedly broke into Connie's condominium through a skylight and hid in a closet while she and David packed clothes for the week. Defense counsel claimed Young's testimony that Connie learned of this incident directly from defendant was inconsistent with her police interview where Young had said that Connie learned of this incident through their mutual friend Don Clapp. Defense counsel also mistakenly implied that Young had told police that Clapp had referred to an astrology chart before the homicides. However, Young clarified in her testimony that she had told police that an astrologer, who was a friend of Connie's, had read the astrology chart, not Clapp.

The third defense reference to Young's police interview came when Young testified that Connie said she was frightened by a loud bang from her patio on the night of March 2, 1983. Defense counsel mistakenly claimed that Young never told the police about this incident. But Young responded she believed she had done so in her audio-recorded interview.[18]

---

[18] Young was correct. Near the end of the interview, she told police that on the night before the homicides, Connie had reported hearing a "big, loud bang" that "scared" and "frightened" her.

Defense counsel also referred to the interview a fourth time, in attempting to clarify the exact wording of defendant's threat to hurt Connie ("I could hurt you if I wanted to . . . and nobody would be able to do anything"), which he made while Connie and Young had breakfast. Defense counsel claimed Young told police that defendant had said, "I don't want to hurt you, but if I wanted to I could do it right here," emphasizing that defendant began by saying that he did not want to hurt Connie. Young mistakenly conceded that that was what she had told police.[19]

Finally, defense counsel attempted to impeach Young with her audio-recorded interview. Young testified about a message defendant had left on Young's answering machine, soon after their breakfast, in which in an "unbelievably breathless voice" he promised to leave Connie alone. Defense counsel asked Young whether she had told the police about this message during her audio-recorded interview. Young claimed she was sure that she did, but did not know why it could not be located in a transcript of that interview.[20]

After defense counsel completed his cross-examination of Young, the prosecutor moved to admit the entire audiotape of Young's police interview, arguing that it was admissible under Evidence Code section 1236, as a prior

---

[19] In the audio-recorded interview, Young did not report defendant saying to Connie, "I don't want to hurt you." Instead, Young told police that defendant said to Connie, "you think I'[m] going to hurt you [but] if I wanted to hurt you I'd hurt you right here, you know, is anybody going to stop me." Later during the same audio-recorded interview, she described defendant's statement again as: "if he wanted to hurt her he could hurt her right there in front of everybody. Nobody would do anything."

[20] Our review of the audio recording reflects that Young did tell the police about this message.

consistent statement, to rebut a claim of fabrication and the claim that her interview was inconsistent with her testimony. Defense counsel objected and argued that only the parts of the recording that concerned his specific questions to Young were relevant because he did not dispute her entire testimony. The prosecutor responded that the entire tape was admissible because defense counsel's cross-examination suggested that Young may have fabricated her testimony or lied outright. The trial court ruled that the entire tape was admissible because "the whole spectrum" of Young's audio-recorded statements to police were the subject of cross-examination.

The prosecutor then played the tape for the jury. At some point while the tape was playing, defense counsel interrupted and interposed an objection. Defense counsel stated, "I think this tape about 30 minutes ago went far beyond any purpose envisioned by the Evidence Code" because it includes the officer's and Young's theories about "what happened, why it happened, and all of the surrounding circumstances," and speculation about whether defendant had "gone berserk and so forth and so on." Defense counsel acknowledged that such evidence might be relevant at the penalty phase, but argued that "at this point it's just totally hearsay, it's totally prejudicial, and it has nothing to do with rehabilitating this witness" based on Young's cross-examination about inconsistent statements. He concluded, "[t]his is just two hours of theory, speculation, innuendo." He also noted that "several jurors are sleeping." Defense counsel further added that his transcript of the tape ended about 20 minutes earlier than the tape played to the jury. The prosecutor explained that it would be difficult to stop the tape now since it would not complete the prior consistent statement, and he suggested that the court could instruct the jury to disregard any speculation made by Young or the officer during the interview.

50

The trial court agreed to play the rest of the tape, and instructed the jury as follows: "When you hear the participants, that is, the witness and the investigating officer, talking and theorizing about what they think went on and things like that, you're not to consider that at all, all right? That's pure speculation on their part. We're only interested in what the witness indicates she told the police officer." After a recess, the court played the remainder of the tape.

### 2. *The contents of Young's audio-recorded interview*

Young's audio-recorded statements to Detective Purcell duplicated much of her trial testimony. There are, however, a number of noteworthy statements on the tape that were not part of her trial testimony.

First, in the audio-recorded statement, Young characterized defendant as "psychotic" and "berserk." She explained that, although defendant normally refrained from using drugs or alcohol, she believed he had been drinking or using drugs in the period leading up to the killings. She also suggested defendant had "connections" with "bad guys" in the criminal "underworld."

Second, Young offered additional details concerning the incident in which defendant broke into Connie's condominium and forced her to sleep with him. Young, apparently repeating descriptions given to her by Connie, said defendant forced Connie to have sex with him but he could not achieve an erection and, instead, was "enraged" and acted "like he was having sex with her."

Third, Young further described one of the encounters she and Connie had with defendant when he followed them to a restaurant. According to Young, they briefly spoke with defendant, who claimed it was coincidental that he was there. After their conversation ended, defendant continued to stare at them as Young and Connie walked away. Young stated that defendant had cuts on his hands, as if he had recently "broke into something."

Fourth, Young described an incident in which she was at Connie's home preparing dinner. Young said she looked out Connie's window and was shocked to discover defendant outside staring inside the condominium through the window. At first, she thought he was holding a gun, but quickly realized that he was holding Connie's dark-colored cat in his arms. Immediately thereafter, Young's daughter arrived for dinner, and Connie let defendant inside where they talked for more than an hour.

Fifth, Young offered additional details concerning Connie's decision to stay away from her home on the weekend before the killings. Young told Detective Purcell that Connie was annoyed when her friend, an astrologer, predicted that defendant would be "in a rage" that weekend. Connie later spoke with Donnie Clapp, however, who warned her that it appeared to him that defendant was "very angry," and that Clapp had never seen him so angry, and Connie took seriously his advice to leave town. Connie decided to leave her home and asked Young to pick her up that evening. When defendant suddenly appeared outside Connie's home as Young arrived to take her away for the weekend, Young said defendant had the face of "a crazy man." That night, Connie slept at Young's house, and Young was so afraid that she barricaded the doors with chairs. Young's daughter saw the chairs and became upset. As a result, Young and Connie decided to stay at a hotel in Laguna Beach for the rest of the weekend. In the interview, Young stated that, after Donnie Clapp warned Connie that defendant had broken into the condominium through the skylight over the weekend, Connie inspected the skylight and noticed a crack.

Sixth, Young claimed defendant had broken into the residence of one of Connie's neighbors, the Rasmussons, the weekend before the homicides, allegedly looking for a duplicate set of Connie's keys, and he stole a watch. She also described Rasmusson's discovery that Connie's door lock was nearly sawed off.

52

Seventh, with respect to the morning defendant appeared at a breakfast on the day before the killings, Young stated that, just after defendant spoke with Connie, defendant complained to Young that Connie seemed "real brave" over the telephone and she appeared willing to "get mean" with him during their phone conversations. Defendant admitted he "couldn't stand it" and that her behavior "just enrages" him.

Eighth, Young described to police two other stalking incidents that she had not personally observed. She briefly described the incident involving George Hoefer, whom defendant stalked after Hoefer had dinner with Connie. Young also offered her own description of the incident in which defendant broke into the condominium while David Navarro was home sick from school.

Ninth, during the interview, Young wondered why defendant decided to kill Connie on that particular night, given all the prior opportunities he had had to do so. She speculated that the homicides were not "premeditated" and that defendant might have followed Connie and Sue that night and might have seen something that enraged him enough to kill both of them.

Finally, throughout the audio-recorded interview, Young repeatedly expressed her fear of defendant, wondering whether defendant would try to target her next, and asked Detective Purcell whether she should be talking to the police and whether she should be given protection. She also expressed her hope that defendant had killed himself.

### 3. Forfeiture

Defendant has forfeited virtually all of his claims regarding the admissibility of the audiotape of Young's entire police interview. First, except to the extent his claims rely on the same facts and legal standards the trial court itself was asked to apply, defendant has forfeited his contentions of federal

53

constitutional error by failing to assert them before the trial court. (*People v. Redd* (2010) 48 Cal.4th 691, 730; *People v. Gutierrez* (2009) 45 Cal.4th 789, 809 [confrontation clause claim forfeited by failing to raise it below].) Below, defendant expressed his objections purely on state law grounds, specifically under the Evidence Code, and made no mention of any confrontation clause or due process violations.[21]

Second, in initially objecting to the playing of the entire audiotape, defendant failed to "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*People v. Partida* (2005) 37 Cal.4th 428, 435.) Only after the court had made its ruling and permitted the playing of the tape in its entirety did defense counsel raise the specific objection that portions of the audiotape contained speculation. Furthermore, defense counsel made no argument in the trial court, as he does now,

---

[21] Although forfeited, we also reject defendant's confrontation clause and due process claims on their merits. Because Young was subject to cross-examination at trial, the admission of her audio-recorded statements did not violate defendant's right of confrontation. (*Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9 ["we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements"].) As to Detective Purcell's statements, although he did not appear as a witness at trial and was not subject to defense cross-examination, the trial court clearly instructed the jury not to consider his statements, but instead to consider only those of Young. *Crawford* makes clear that the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Ibid.*) Here, Detective Purcell's statements were admitted for the nonhearsay purpose of giving context to Young's answers. Defendant's confrontation and due process claims, therefore, fail on the merits.

that the audiotape contained prejudicial evidence of Young's fear of defendant, her belief in defendant's guilt, or Detective Purcell's belief as to defendant's guilt. The trial court certainly had no prior knowledge of what was on the audiotape, and it, therefore, depended on the parties to alert it to any irrelevant or prejudicial material. "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Ibid.*)

The sole claim defendant has preserved for review on appeal is the claim that the admission of the entire audiotape did not comport with Evidence Code, section 1236, the hearsay exception for prior consistent statements. We will examine this claim on the merits.

### 4. *The admissibility of the entire audio-recorded interview*

To be admissible as an exception to the hearsay rule, a prior consistent statement must be offered (1) after an inconsistent statement is admitted to attack the testifying witness's credibility, where the consistent statement was made before the inconsistent statement; or (2) when there is an express or implied charge that the witness's testimony recently was fabricated or influenced by bias or improper motive, and the statement was made prior to the fabrication, bias, or improper motive. (Evid. Code, §§ 791, 1236.) We are presented with the latter situation — an express or implied charge that Young's testimony recently had been fabricated or influenced by bias or improper motive — governed by subdivision (b) of Evidence Code section 791.

In the cross-examination of Young, defense counsel suggested that Young, in her police interview, had failed to mention important facts and was thus fabricating her testimony. "[R]ecent fabrication may be inferred when it is shown that a witness did not speak about an important matter at a time when it would have been natural for him to do so," and in such a circumstance, "it is generally

proper to permit rehabilitation by a prior consistent statement." (*People v. Manson* (1976) 61 Cal.App.3d 102, 143; see also *People v. Williams* (2002) 102 Cal.App.4th 995, 1011-1012; *People v. Gentry* (1969) 270 Cal.App.2d 462, 473.) Specifically, defense counsel claimed, in cross-examining Young, that she had never told police that Connie reported hearing a loud bang from her patio the night before her death or that defendant left a message on Young's answering machine in a breathless voice. Defense counsel also claimed that Young had never told police that defendant threatened Connie that he could hurt her if he wanted to. Instead, defense counsel claimed Young had told police defendant said he did not want to hurt Connie. These claims by defense counsel were refuted by Young's prior consistent statements in her audio-recorded interview with Detective Purcell.

Although portions of Young's audio-recorded statements to the detective were properly admitted to refute defendant's characterization of her testimony, this circumstance does not necessarily establish that the entire recording was admissible. To justify admission of the rest of recording, the Attorney General invokes the rule of completeness, which would allow admission of the entire recording if necessary to the understanding of the otherwise admissible portions.[22] (Evid. Code, § 356.) But it does not appear that the portions of the audio recording relevant to rehabilitate Young created a misleading impression requiring the playing of the entire recording to correct any such misimpression, and the

---

[22] Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

56

prosecutor made no such argument below. (*People v. Samuels* (2005) 36 Cal.4th 96, 130 ["The purpose of Evidence Code section 356 is to avoid creating a misleading impression"].) Certainly, Young's long narratives to Detective Purcell, which merely duplicated much of her trial testimony about the history of defendant's relationship with Connie, had little relation to either the specific language with which defendant threatened Connie on March 2, 1983, or whether Connie had been awakened by a loud bang the night before her death. Accordingly, the trial court erred in admitting those portions of the audio-recorded interview that did more than rehabilitate Young's testimony.

### 5. *Admission of the entire audio-recording was harmless error*

We conclude that any error under the Evidence Code in admitting the entire audio-recorded statement (and not only those statements that refuted defense counsel's characterization of Young's testimony) was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836-837 [state law error measured under reasonable probability standard].) Any prejudice from Young's beliefs about defendant's criminal associations, her fear of defendant, and her speculation that the killings were not premeditated, was substantially mitigated by other admissible evidence. As we explain, other evidence and reasonable inferences therefrom established a basis for Young's beliefs.

There was considerable evidence of defendant's criminal association with partner-in-crime Samuel Sabatino, his suspected involvement in numerous burglaries, and defendant's repeated acts of breaking into Connie's residence. In addition, defendant himself bragged that no locks could keep him out. Thus, Young's beliefs about defendant's criminal associations and his burglary skills were amply confirmed by other admissible evidence.

Young's fear of defendant and concern for her own safety was a reasonable inference based on the evidence that Young had been present numerous times where defendant stalked Connie. Young also had personally observed Connie's fear of defendant in the weeks leading to her death. Under these circumstances, even without Young's audio-recorded statements, it was reasonable and, perhaps, inescapable to infer that Young feared defendant and would have become more afraid upon learning of her close friend's death.

Young's speculative statements about why defendant killed the victims on the night he did and her skepticism about whether the killings were premeditated, could not have prejudiced defendant. In fact, her speculation assisted defendant by suggesting a lesser culpability, induced by a heat of passion.

With respect to defendant's claim that he was prejudiced by Detective Purcell's similar speculation during the audio-recorded interview, we note the detective made few pronouncements during his questioning of Young. He discussed his opinion of defendant only as he tried to assure Young that she would no longer be in danger if she cooperated with the police. In particular, Detective Purcell assured Young that the police were "going to get him," and that she would probably be in less danger if defendant knew she had already talked to police, because "then what's he got to gain by silencing you?" The closest the detective came to expressing his belief in defendant's guilt was when he reacted to Young's hope that defendant had killed himself. Detective Purcell responded, "I suppose officially I shouldn't hope that. But that would certainly end a lot of misery."

More importantly, the effect of any of the speculation voiced by Young and Detective Purcell during the audio-recorded interview was quelled by the trial court's admonition to ignore this "pure speculation" and focus only on what Young "told the police officer." We assume the jury complied with this instruction. (*People v. Pride* (1992) 3 Cal.4th 195, 240.)

58

Overall, although Young's audio-recorded statements to Detective Purcell recounted not only additional details concerning defendant's stalking but also included incidents she had not described during her testimony, her statements, viewed in context of the entire guilt phase, added nothing that was prejudicial to defendant. Young's descriptions of the George Hoefer incident and the incident in which defendant broke in while David Navarro was home from school did not stray significantly from the direct testimony of both Hoefer and Navarro in describing these incidents. In fact, her descriptions of these incidents were comparatively vague compared to the witnesses' actual testimony of the incidents. Young's belief that defendant had broken into the home of Connie's neighbor — and her description of the incident in which defendant appeared at Connie's window holding her cat — were cumulative to all of the other incidents of stalking personally witnessed and testified to by the prosecution's witnesses, including Young. Similarly, the additional details that Young provided to Detective Purcell concerning the night defendant broke into Connie's home and slept with her, and Connie's actions on the Friday before her death, added additional credence as to Connie's fear of defendant. These details, however, were cumulative to the enormity of evidence showing that Connie was increasingly afraid of defendant in the week before she was killed.

**B. Limitations on Defendant's Impeachment of James Navarro**

Defendant contends the trial court violated his right to confrontation under the Sixth Amendment by preventing the defense from impeaching James (Mike) Navarro concerning alleged alterations to a taped conversation in which Connie

sought advice in obtaining a restraining order.[23] We conclude the court properly exercised its discretion in limiting impeachment under Evidence Code section 352.[24]

### 1. Background concerning the answering machine audiotape

Mike Navarro testified that he had remained good friends with Connie, despite their divorce, and she had confided in him about her problems with defendant. Connie and David stayed at Mike's residence in the days before the killings. During that time, Connie told him that she was terrified of defendant and was considering seeking a restraining order against him. He referred her to an attorney to help her obtain a restraining order. Mike said that he believed Connie did consult with the attorney he recommended. Mike was the person who discovered Connie's and Sue's bodies at Connie's condominium.

Mike testified that, just a few weeks prior to testifying at trial, he discovered his answering machine had recorded a telephone conversation between Connie and an unidentified female about obtaining a restraining order. Mike explained that, at the time Connie stayed at his residence, he had an answering machine that would answer on the first ring, and if someone answered the call in another room, the machine could have recorded an incoming call, unbeknownst to the parties. Mike stated that he had removed the tape from his answering machine

---

[23] Defendant asserts he was prevented from cross-examining Navarro on this issue, but, as will be explained, the claim is better framed as alleged interference with a defense attempt to impeach Navarro.

[24] Evidence Code section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

soon after the killings because he knew it would have Connie's voice on it, but he did not play the entire tape at that time because it would have been painful for him to hear her voice. He explained that in preparing for his testimony, he decided to listen to the entire tape and discovered the conversation about the restraining order. He then notified the prosecutor of his discovery.

On the tape played to the jury, which Mike identified as being taken from his answering machine, Connie is heard talking to an unidentified female. Connie does not specifically mention defendant's name. Connie complains of harassment and tells the other party that "he had threatened all kinds of things" but had not threatened "to kill me or hurt me." The unidentified female advises Connie to obtain a restraining order because then the harassment would be actionable by police and "our office" could "file a complaint and have him cited into court . . . on charges." Connie explains that she is supposed to meet with an attorney that morning and asks whether it would be cheaper if she sought help through a women's legal clinic. The unidentified female says that she can give Connie the telephone number of the Los Angeles County Bar Association for a referral, but after the unidentified female places Connie on hold, one of the parties terminates the call and the recording ends.

Defense counsel impeached Mike with a 1975 court document produced during his divorce from Connie. The document showed that Connie had obtained a restraining order against Mike because he had threatened her. Mike did not recall the part of the order that prohibited him "from annoying, harassing or molesting" Connie.

More than a week after the court played the answering machine tape for the jury, defense counsel informed the trial court that they had learned the tape Mike had provided was a brand and type of cassette tape that was not manufactured until 1992 — some nine years after the alleged date of the recording. Defense counsel

also claimed that the rest of the tape sounded to him more like a wire tap than an answering machine tape. The trial court postponed the trial for one day to allow the defense time for an expert to examine the tape.

On the next court date, defense counsel reported that his expert further concluded both that the tape was recorded in stereo and, therefore, inconsistent with being an answering machine tape from 1983, and that the tape had possibly been edited. Defense counsel stated his expert had concluded the tape was a copy and the expert was going to testify the following day to explain the anomalies.

The following day, the prosecutor announced that the dispute regarding the tape was a "nonissue" because he had learned from Mike that Mike had copied the conversation from the original tape to the tape used in court. The prosecutor also stated that the reason it appeared that Connie's conversation had been edited was that subsequent messages had been recorded over the conversation. The prosecutor further explained that the conversation could not have concerned Connie's 1975 restraining order against Mike because the other conversations and messages on the tape dated from the time around the homicides. The prosecutor warned that if the defense sought to dispute the authenticity of the original 1983 tape, he would be compelled to call numerous witnesses to establish the timeframe for the recording, and that some of this additional evidence might be harmful to defendant. The prosecutor gave the defense the original 1983 tape for inspection by the defense expert.

The court thereafter permitted defense counsel to question Mike about the tape outside of the jury's presence. During questioning, Mike stated that he never testified that the tape played for the jury was the original. He explained that he had decided to make a copy of the tape because the original tape contained many personal messages for himself and his son, including a conversation between his son and his son's maternal grandmother expressing concern over Connie's safety,

62

and an earlier conversation about his son becoming intoxicated over New Year's Eve in 1982.

Later that same day, after the defense expert had conducted a preliminary analysis of the original tape, the defense sought a stipulation regarding the manufacture date of the tape that was played to the jury, and also sought to cross-examine Mike about the inconsistency. Defense counsel argued that evidence of the tape's manufacture date was relevant to impeach Mike. Counsel conceded that Mike never used the word "original" when describing the tape to the jury, but asserted that Mike had lied because he had identified the tape as being from his answering machine.

In response, the prosecutor renewed his objection on Evidence Code section 352 grounds. The trial court agreed, observing that there was no evidence the recording was not of Connie or was not accurate. The court noted that the recorded conversation was a "very small part" of the prosecution's case, and concluded that the proposed impeachment was not material. The court also observed that, in light of the other firsthand accounts of defendant stalking and harassing Connie, the credibility of Mike would not be a significant issue for the jury.

Subsequently, defense counsel stated that their expert had examined the original tape for a few hours, but the expert needed more time for a meaningful analysis. The prosecutor offered that, if the defense expert found any relevant anomalies, he could have the FBI conduct an examination in approximately two days, but he added that any further delay did not seem to be time or cost effective. Thereafter, defense counsel made no specific request for a continuance, and the parties began their guilt phase closing arguments the following morning. The defense ultimately put forth no evidence challenging the authenticity of the original tape.

63

2. *Under Evidence Code section 352 the court properly denied defense counsel's impeachment of Mike Navarro with the manufacture date of the tape played to the jury*

"A trial court has broad discretion under Evidence Code section 352 to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' This discretion allows the trial court broad power to control the presentation of proposed impeachment evidence ' " 'to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' [Citation.]" ' " (*Mills, supra,* 48 Cal.4th at p. 195, quoting *People v. Lewis* (2001) 26 Cal.4th 334, 374-375.) On appeal, we evaluate rulings under Evidence Code section 352 using the abuse of discretion standard. (*Mills, supra,* at p. 195.)

The circumstances here clearly demonstrate that the trial court did not abuse its discretion. The trial court reasonably concluded that Mike's use of a copy, without any evidence suggesting that the original recording of Connie's conversation was not authentic or different from the copy, was of no relevance. Even if the defense had been permitted to impeach Mike regarding the tape, Mike presumably would have offered the same explanation he provided to the defense when he testified outside the jury's presence. Based on our review of the original tape, Mike's explanation was credible and understandable.

On the original tape,[25] following the recording of Connie's call about the restraining order, there is a recording of her son David speaking to his

---

[25]     The original tape was marked as People's exhibit No. 113, but it was ultimately not played for the jury or used during deliberations.

64

grandmother in which she expresses concern about Connie and her safety in relation to defendant. On the other side of the tape is a series of recordings that appear to have been made on New Year's Eve 1982. It contains several messages from Connie expressing her worry about being unable to locate David. These messages are followed by a seven-minute conversation between David and Connie, in which Mike occasionally comes on the line. During the call, David jovially admits he is drunk and rambles for much of the conversation while Connie lovingly humors him.

Thus, any impeachment of Mike regarding his actions with respect to the tape would not have suggested to the jury, as defendant argues, that Mike was a third party suspect who was attempting to frame defendant. Instead, his actions simply reflect that he was sensitive to his son's privacy in light of his mother's death. The tape's sentimental value is evident, and any impeachment based on the tape would have generated only greater sympathy for Mike and his son before the jury.

Finally, in the absence of any error under Evidence Code section 352, we also reject defendant's various constitutional claims. The routine and proper application of state evidentiary law does not impinge on a defendant's due process rights. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010.) Additionally, "reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value . . . generally does not contravene a defendant's constitutional rights to confrontation and cross-examination." (*People v. Brown* (2003) 31 Cal.4th 518, 545.) "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (*Delaware v. Fensterer* (1985) 474 U.S. 15, 20.) As the trial court correctly noted, the proffered impeachment was of marginal value.

Defendant also contends that the trial court erred by denying him a continuance to explore further the authenticity of the original tape. We discern in the record no defense request for a continuance to allow further evaluation of the original 1983 tape, and hence defendant has forfeited this claim. In any event, "[i]n the absence of a showing of an abuse of discretion and prejudice to the defendant, a denial of a motion for a continuance does not require reversal of a conviction." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1126.) The trial court did not prohibit defense counsel from further testing of the original 1983 tape, and, more importantly, the record does not disclose how any further testing of the original tape would have been favorable to defendant.

### C. The Admission of Connie's Statements Concerning Her Fear of Defendant

Defendant asserts the trial court violated Evidence Code section 1250[26] and his right to confrontation under the Sixth Amendment by admitting Connie's statements about her fear of defendant. He also asserts the court's failure to exclude these statements under Evidence Code section 352 violated not only state law but also his federal right to due process. He further claims the erroneous admission of these statements was prejudicial and could not have been cured by any limiting instruction, which, in any event, the court failed to give. As we

---

[26] Evidence Code section 1250 permits admission of "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) . . . when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a).) The section does not, however, permit admission of "a statement of memory or belief to prove the fact remembered or believed." (Evid. Code, § 1250, subd. (b).)

66

explain below, most of Connie's statements, and her conduct in conformity with those statements, were relevant to proving defendant's motive and were admissible, and any error in admitting all her statements was harmless. In conducting this analysis, it is important to distinguish among concepts of relevancy, hearsay, nonhearsay, trustworthiness, and prejudice, all of which require distinct consideration in determining whether Connie's statements were admissible.

### 1. The trial court ruling admitting Connie's fear of defendant and evidence of his stalking her

In order to examine the relevance of Connie's fear of defendant, we describe the circumstances leading to the trial court's rulings admitting evidence of Connie's fear of defendant and evidence that defendant had stalked her prior to the killings.

Before trial, the defense moved to exclude any evidence offered to establish Connie's fear of defendant, asserting that such evidence was inadmissible hearsay, irrelevant, and prejudicial under Evidence Code section 352. The prosecutor opposed the motion, arguing that the evidence was admissible as nonhearsay, and that no hearsay exception was required to admit evidence of Connie's state of mind and her behavior in conformity with her fear. The prosecutor also argued that Connie's fear of defendant was relevant to show that she would not have admitted defendant into her home on the night of the killings. The defense countered that Connie's state of mind was not in question, and the issue of whether defendant was welcome in her home was uncontested, because the defense contended defendant was elsewhere at the time of the homicides.

The parties also filed motions regarding evidence of defendant's stalking, and the prosecution's motion contained references to Connie's state of mind and her statements expressing her fear, many of which the prosecutor ultimately

introduced at trial. The prosecutor's written motion seeking to admit evidence of defendant's stalking contained four exhibits: (1) a police interview statement, in which David Navarro described the incident when defendant broke into the condominium and handcuffed him; (2) police notes of an interview of George Hoefer, in which Hoefer described defendant's threats after Hoefer had dinner with Connie; (3) Detective Purcell's interview notes for the audio-recorded interview of Marilyn Young, described *ante*, part III.A.; and (4) police interview notes of a statement given by Craig Spencer, in which he broadly described Connie's problems with defendant and described seeing defendant feign shooting a gun at Connie with his forefinger.

At the hearing on the motion to admit evidence of defendant's stalking, defense counsel objected to the stalking evidence, arguing that its "blanket introduction" would present the danger of introducing "third-, fourth-hand type hearsay." The prosecutor responded by identifying "the four specific instances" of stalking that he had attached as exhibits to his motion. The prosecutor, furthermore, assured the trial court that the state's witnesses would testify only as "specifically to percipience and will have nothing whatsoever to do with hearsay," and that he intended to put forth only witnesses who "were present that physically saw things."

The court ruled that the stalking incidents witnessed by Connie's son David, Craig Spencer, George Hoefer, and Marilyn Young were admissible but if "their testimony is different, then I would anticipate there would be an objection by counsel for defendant and I would rule on that objection." Although Connie's son David, Craig Spencer, and George Hoefer had each described discrete incidents of stalking, Marilyn Young's statements to Detective Purcell did not, and neither the parties nor the court identified which incidents described by Young were admissible.

68

Immediately thereafter, the parties argued the motion regarding the admissibility of Connie's statements. Defense counsel again asserted that it appeared the prosecutor sought to admit hearsay evidence merely to bolster his theory of the case, and argued that the defense was not placing at issue Connie's fear of defendant on the night of the killings, but was instead relying on an alibi theory.

The prosecutor replied that, despite defendant's alibi defense, the prosecution was required to prove that Connie would not have let defendant into her home. He advised the court, however, that some of Connie's statements might be "so prejudicial to the defense that under [Evidence Code section] 352 you're going to keep them out." The prosecutor went as far to "concede" that "a 352 objection would be appropriate" and that "352 should keep out" Connie's statements relating to her alleged kidnapping at gunpoint and the incident when defendant allegedly disabled her vehicle in a parking garage. The prosecutor clarified he sought to admit only "innocuous" statements in which Connie said she was afraid of defendant, as well as her statements concerning her fear of staying at home, her decision to change her locks, her attempts to stay away from her condominium, her inquiry about obtaining a restraining order, and the letter she had addressed to defendant. The prosecutor clarified that he believed such evidence was admissible, and again conceded that if "we go too far overboard that it is too prejudicial."

The court ruled that the "specific acts" identified by the prosecutor identified were admissible to show Connie's fearful state of mind and her actions in conformity with that fear, and that "we're staying away from these fact situations . . . that don't relate to whether or not your client was in the apartment or not at this time." The court also concluded that the probative value of "those specific instances" outweighed any prejudicial effect they might have.

69

## 2. *Evidence of Connie's fear of defendant*

During trial, Marilyn Young testified that Connie told her that she wanted to end her relationship with defendant, and that defendant was no longer welcome in her condominium. Young reported that someone had told Connie that defendant had broken into her condominium through the patio, and that Connie became "petrified" when her neighbor, Carl Rasmusson, had discovered that someone had tampered with the lock on her patio door. According to Young, Connie told her she changed her locks and installed a rudimentary alarm system because she was frightened that defendant would hurt her. She also related Connie's descriptions of the incident in early 1983 in which defendant broke into Connie's condominium and forced her to sleep with him, and the incident when Connie's car failed to start and defendant suddenly appeared in the parking garage claiming he had tampered with the wires. Young also recounted Connie's description of the "kidnapping" weekend in which defendant took her away her at gunpoint and stayed with her in a hotel room. She testified that Connie was "very upset" by the incident in which defendant broke into the condominium while David was home and threatened to kill himself, and recalled that Connie discussed obtaining a restraining order against defendant. Young explained that she and Connie went out of town the weekend before the homicides because one of Connie's friends had warned her that defendant "was in a rage" and that she should leave. She testified that when they returned home from that weekend, Connie discovered that the condominium's alarm system had been disabled, and she subsequently learned from a friend that defendant may have broken in through a skylight, and was hiding in a closet at the condominium while Connie and David were there to retrieve clothes. Young described keeping Connie company as much as possible because of Connie's fears concerning defendant.

Carl Rasmusson testified that Connie had confided to him and his wife about problems she had been having with defendant. Rasmusson stated that Connie asked the couple to keep an eye on her condominium because she was frightened and believed she was being followed. He described Connie as "very upset and distraught" and "very afraid for her life." His wife, Janet Rasmusson, testified similarly.

Mike Navarro testified that Connie was "terrified" of defendant and was considering obtaining a restraining order. Mike also related Connie's description of the "kidnapping" incident, and her disclosure that defendant had forced her to call Mike that weekend to tell him that she was all right, even though, as she later explained to him, she was not. Mike explained that, just before her death, Connie told him she had decided to return to her condominium because defendant had assured her that he would leave her alone.

Stephanie Brizendine described a letter, apparently written by Connie, that defendant showed to Brizendine on the night of the killings. According to Brizendine, the letter revealed that Connie was "absolutely living in fear" because defendant had been breaking into her residence and refused to leave her alone.

Finally, in addition to the audiotape of Connie's phone call concerning a restraining order and her day planner showing she had changed her locks on January 31, 1983, the court admitted the draft of Connie's letter, dated February 18, in which she vividly expressed to defendant how his conduct was frightening her.

71

During the above described testimony, defendant did not renew any specific objections under Evidence Code section 352.[27]

### 3. *Connie's state of mind was relevant to prove defendant's motive*

In determining the admissibility of Connie's statements, we first examine the threshold requirement of relevance. (Evid. Code, § 210.)

"A hearsay objection to an out-of-court statement may not be overruled simply by identifying a nonhearsay purpose for admitting the statement. The trial court must also find that the nonhearsay purpose is relevant to an issue in dispute." (*People v. Armendariz* (1984) 37 Cal.3d 573, 585.) Similarly, Evidence Code section 1250, which authorizes the admission of out-of-court statements to prove the declarant's state of mind, permits the admission of such evidence only if the declarant's state of mind "is itself an issue in the action" or if the evidence "is

---

[27] Given the in limine proceedings, it is questionable whether defendant preserved many of his claims on appeal. "Generally when an *in limine* ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal." (*People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3.) In light of the prosecutor's assurances that he did not intend to introduce hearsay evidence of stalking and because some of the now challenged statements solicited by the prosecutor clearly exceeded the scope of the trial court's in limine rulings, it is debatable whether the defense's in limine objections dispensed with the need for defendant to renew his objections when many of Connie's statements actually were introduced during the course of the trial. (*Ibid.* ["The reason for this rule is that until the evidence is actually offered, and the court is aware of its relevance in context, its probative value, and its potential for prejudice, matters related to the state of the evidence at the time an objection is made, the court cannot intelligently rule on admissibility"]; see also *People v. Brown, supra,* 31 Cal.4th at p. 547; Evid. Code, § 353.) The Attorney General, however, does not argue forfeiture, and given the sheer number of statements admitted "from the grave" in this matter, we will examine the merits of defendant's arguments regarding all of the complained-of statements.

72

offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a)(1)-(2).) "[R]elevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 821 (*Jablonski*), quoting Evid. Code, § 210.)

Evidence that "tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive" is generally admissible. (*People v. Garceau* (1993) 6 Cal.4th 140, 177.) Although motive is normally not an element of any crime that the prosecutor must prove, "evidence of motive makes the crime understandable and renders the inferences regarding defendant's intent more reasonable." (*People v. Roldan* (2005) 35 Cal.4th 646, 707.) " 'Evidence tending to establish prior quarrels between a defendant and decedent and the making of threats by the former is properly admitted . . . to show the motive and state of mind of the defendant.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 668, quoting *People v. Cartier* (1960) 54 Cal.2d 300, 311.) We review a trial court's relevance determination under the abuse of discretion standard. (*Jablonski, supra,* 37 Cal.4th at p. 821.)

At the time of the in limine ruling, the trial court ostensibly admitted Connie's statements of fear, and her conduct in conformity with that fear, to prove her lack of consent to defendant's entry into her condominium on the night of her death. The trial court, however, did not instruct the jury as such, nor would Connie's lack of consent appear essential to prove any of defendant's charged crimes. (*People v. Deptula* (1962) 58 Cal.2d 225, 228 ["the settled interpretation of the statute is that one who enters a room or building with intent to commit larceny is guilty of burglary even though express or implied permission to enter has been given to him personally or as a member of the public"]; see also *People v. Frye* (1998) 18 Cal.4th 894, 953, 954 [defendant who enters house with

requisite intent is guilty of burglary, even if the victim consents to entry]; *People v. Pendleton* (1979) 25 Cal.3d 371, 382 ["one may be convicted of burglary even if he enters with consent, provided he does not have an unconditional possessory right to enter"].)

The trial court's instructions, however, indicated that Connie's statements of fear, and her conduct in conformity with that fear, could be considered for the limited purpose of proving defendant's motive for the crimes. The court specifically ruled, and instructed the jury, that evidence of defendant's uncharged "other crimes" was relevant for the limited purpose of showing defendant's motive and to show that defendant "had knowledge or possessed the means" necessary for the charged crimes. It also instructed the jury that "[p]resence of motive may tend to establish guilt." At issue here, therefore, is whether Connie's out-of-court statements of fear and her conduct stemming from that fear were relevant and admissible to prove defendant's motive to kill her.

Our cases repeatedly have held that under Evidence Code section 1250, a victim's out-of-court statements expressing fear of a defendant are relevant only when the victim's conduct in conformity with that fear is in dispute.[28] (*Jablonski, supra*, 37 Cal.4th at pp. 819-820; *People v. Hernandez* (2003) 30 Cal.4th 835, 872; *People v. Ruiz* (1988) 44 Cal.3d 589, 608 (*Ruiz*); *People v. Armendariz, supra,* 37 Cal.3d at pp. 585-586; *People v. Arcega* (1982) 32 Cal.3d 504, 526-527; *People v. Green* (1980) 27 Cal.3d 1, 23, fn. 9; *People v. Ireland* (1969) 70 Cal.2d

---

[28]    Closely related is Evidence Code section 1251, which permits the admission of a declarant's statement describing his or her prior "state of mind, emotion, or physical sensation" if the declarant is unavailable as a witness, and "the evidence is not offered to prove any fact other than such state of mind, emotion, or physical sensation." (Evid. Code, § 1251.)

522, 529-530.) We have upheld the admission of such evidence under Evidence Code section 1250 when the victim's fearful state of mind rebutted the defendant's claims that the victim's death was accidental (*People v. Lew* (1968) 68 Cal.2d 774, 778-780), or provoked (*People v. Spencer* (1969) 71 Cal.2d 933, 945-946), or that the victim voluntarily disappeared (*People v. Crew* (2003) 31 Cal.4th 822, 840), or when the victim's state of mind is relevant to an element of an offense (*People v. Sakarias* (2000) 22 Cal.4th 596, 629).

In *Jablonski*, *supra*, 37 Cal.4th 774, for example, the defendant's estranged wife and her mother were assaulted and killed inside their home. Both had made statements to third parties describing their fear of the defendant. We noted that, unlike the wife's statements, the mother's stated fear of the defendant had been communicated to him and that this circumstance rendered the evidence relevant to whether the defendant premeditated the murders. (*Id*. at p. 820.) Although we held that the mother's statement was not admissible to prove that she was actually fearful under Evidence Code section 1250, we held that this evidence was relevant for the nonhearsay purpose of its effect on defendant. We explained that the mother's stated fear of the defendant was relevant to show its effect on him because such evidence "had some bearing on his mental state in going to visit the women" and as to how the defendant "planned to approach the victims (by stealth as opposed to open confrontation) both of which, in turn, were relevant to premeditation." (*Jablonski, supra,* at p. 821.)

Two cases, however, suggest a possible conflict as to whether a decedent's out-of-court statements expressing fear of a defendant are relevant under Evidence Code section 1250 to prove the defendant's motive in the crimes against the victim.

In *Ruiz*, *supra*, 44 Cal.3d 589, we rejected the contention that the victims' fear of defendant was admissible to prove that the relationships between the

defendant and the victims were troubled, thereby supplying defendant with a motive to kill them. "[A] victim's prior statements of fear are not admissible to prove *the defendant's* conduct or motive (state of mind). If the rule were otherwise, such statements of prior fear or friction could be routinely admitted to show that the defendant had a motive to injure or kill." (*Id.* at p. 609; see also *People v. Noguera* (1992) 4 Cal.4th 599, 622.)

But a Court of Appeal decision, upon which the Attorney General relies, held that the victim's state of mind and conduct were relevant to prove the defendant's motive in a wrongful death civil action because "[t]he proffered evidence explained how Nicole was feeling about Simpson, tended to explain her conduct in rebuffing Simpson, and this in turn logically tended to show Simpson's motive to murder her." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 594 (*Simpson*).) Without this evidence, "the jurors might believe there was nothing in the relationship between Simpson and Nicole which would precipitate a murder." (*Id.* at p. 595.)

Neither *Ruiz* nor *Simpson* cites any authority for its holding concerning the relevance of a decedent victim's fear to prove a defendant's motive. Moreover, nothing in Evidence Code section 1250 expressly prohibits or allows the admission of such evidence to prove motive. The Assembly Committee on the Judiciary's comment to the statute, however, observes that a decedent's statements describing "threats or brutal conduct by some other person" cannot be used to "prove the truth of the matter stated" or "as a basis for inferring that the alleged threatener must have made threats."[29] (Assem. Com. on Judiciary com., reprinted

---

[29] The Assembly Committee on the Judiciary also noted that the Legislature passed Evidence Code section 1250, in part, to repudiate the holding of *People v.*

*Footnote continued on next page*

at 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1250, p. 282 (West's Ann. Evid. Code).)

The different conclusions reached by *Ruiz* and *Simpson* are generally compatible if one additional foundational circumstance is considered in the analysis — whether the defendant was aware of and reacted to the decedent victim's fearful state of mind and the victim's actions in conformity with that fear. This circumstance is crucial in determining a relevant connection between a defendant's motive and the victim's state of mind.

In *Ruiz*, the three victims made statements to third parties that they disliked the defendant, and were "frightened" and " 'scared to death' " of him. One victim reported that the defendant had assaulted him. (*Ruiz, supra,* 44 Cal.3d at pp. 600, 602.) Another victim told third parties that she intended to move out of the defendant's household and warned, " 'If you don't see me or hear from me in two weeks, I won't — I will be dead' " and that if she or her son " 'show up missing, raise hell with the police.' " (*Id.* at p. 602.) Unlike *Jablonski*, our decision in *Ruiz* contained no suggestion that the defendant was aware of these statements or that similar statements had been communicated to him. There also was no indication whether the defendant was aware of actions the victims had taken in conformity with their fears. In such circumstances, the victims' fear of the defendant,

_____

*Footnote continued from previous page*

*Merkouris* (1959) 52 Cal.2d 672, which held that the decedent victims' statements describing the defendant's threats were admissible to show not only their fear of him but also to show that the defendant had in fact threatened them. "The exception created by *Merkouris* is not based on any probability of reliability; it is based on a rationale that destroys the very foundation of the hearsay rule." (Assem. Com. on Judiciary com., West's Ann. Evid. Code, *supra*, foll. § 1250, p. 281.)

standing alone, was not relevant to prove anything about his conduct or state of mind.

In contrast, in *Simpson*, the Court of Appeal described a wealth of evidence establishing that the defendant was aware of the victim's fear, which explained her rejection of him, and was motivated by that rejection. The evidence established, among other facts, that the defendant had physically assaulted the victim in the past, the victim had divorced the defendant and moved out of their home, the defendant later had forced an entry into her residence and she called the police to have him removed, they had argued, and on the day of the crimes defendant appeared angry because the victim had refused to invite him to a family function. (*Simpson*, *supra*, 86 Cal.App.4th at pp. 582-583, 587-590.) The victim's fear of the defendant, therefore, was relevant because it explained her repeated rejection of him and her conduct in refusing to reconcile with him, which in turn generated his anger and motive to kill her. (*Id.* at pp. 593-594.)

Upon examining the differences concerning each defendant's knowledge in *Ruiz* and in *Simpson*, the basis for the opposing relevancy determinations in the two cases becomes clear. The victims' state of mind in *Ruiz* was not relevant to the defendant's motive without foundational evidence that the defendant was actually aware of their fear, and any conduct in conformity with that fear, and was motivated by it. But the victim's state of mind in *Simpson* was relevant to the defendant's motive in that case because there was ample foundational evidence, independent of the victim's statements, that the defendant was aware of the victim's fear, which explained her conduct in conformity with that fear, and he reacted to her conduct by becoming enraged due to the victim's refusal to reconcile.

Thus, *Ruiz* and *Simpson* differ because in the latter case the victim's fear led to a rejection of the defendant that motivated him to kill. The victim's fear

78

may explain the victim's conduct, but standing alone it does not necessarily provide a defendant's motive to kill. Generally, it is the rejection that provides a defendant's motive, not the victim's fear. Accordingly, the victim's fearful state of mind concerning the defendant explains in part why a victim may not wish to reconcile, and the defendant's knowledge of that rejection may have a deleterious effect on the relationship that can be relevant to a defendant's subsequent actions and motive, even though at trial the defendant does not directly dispute the victim's state of mind. (Evid. Code, § 1250, subd. (a)(1).)

In the present case, as in *Simpson*, ample foundational evidence, independent of Connie's statements, suggested that defendant was well aware that Connie was fearful of him, no longer desired a relationship with him, and took actions in conformity with her fear. In addition to the eyewitness testimony describing defendant's numerous acts of stalking Connie, all of which would unquestionably cause her to become fearful, defendant admitted he was despondent over the end of the relationship, acknowledged he had disabled her newly installed home alarm, claimed he had stolen a letter describing Connie's fears, and admitted to Connie that, despite her precautions, he could hurt her if he wanted to. Defendant also complained to Young that Connie seemed "real brave" over the telephone and she appeared willing to "get mean." He admitted to Young that he "couldn't stand it" and that her behavior "just enrages" him.

Moreover, as in *Jablonski* and *Simpson*, the evidence also revealed that defendant reacted to Connie's fear and rejection and was not only motivated by it, but also sought to manipulate it. As their relationship deteriorated, defendant tried to force Connie back into a relationship and also tried to ensure that she did not date anyone else. By mid-February 1983, however, Connie had made clear that their relationship was over. Defendant responded by escalating his pattern of stalking behavior that suggested he intended to ambush and kill her. This led

79

Connie to become increasingly fearful of him, eventually culminating in her decision to leave her home. When defendant lost track of her, he broke into her home and discovered a letter vividly describing her fear of him. Defendant then adjusted his strategy by assuring Connie in public that he would leave her alone, which caused her to become less fearful of him and move back into her home. Defendant exploited her reduced fear and her decision to return home by ambushing her there. Thus, defendant's uncharged "other crimes" of stalking, and the fear it generated in Connie's mind, were uniquely relevant to his guilt in the charged murders. Defendant's knowledge and manipulation of Connie's fear of him illuminates his motive and, as in *Jablonski*, his actions reflected he used that knowledge as a premeditated means to ambush and kill her.[30]

Therefore, Connie's statements describing her fear of defendant and her actions in conformity with that fear, given defendant's awareness of these circumstances and his responses to them, explained how a once peaceful relationship had deteriorated into a case of stalking leading to murder.

Accordingly, we conclude that evidence of the decedent's state of mind, offered under Evidence Code section 1250, can be relevant to a defendant's motive — but only if there is independent, admissible evidence that the defendant was aware of the decedent's state of mind before the crime and may have been motivated by it. (See *Commonwealth v. Qualls* (Mass. 1997) 680 N.E.2d 61, 64 ["The state-of-mind exception to the hearsay rule calls for admission of evidence

---

[30] We also note that California's statutory definition of stalking specifically requires the People to prove that a defendant stalked his victim "with the intent to place that person in reasonable fear for his or her safety" (Pen. Code, § 646.9, subd. (a)) and that the defendant's harassment caused the victim to be "seriously" alarmed, annoyed, tormented, or terrorized (*id.*, subd. (e)).

of a murder victim's state of mind as proof of the defendant's motive to kill the victim when and only when there also is evidence that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it"]; *Commonwealth v. Sharpe* (Mass. 2009) 908 N.E.2d 376, 382-383 [same]; see also *State v. Calleia* (N.J. 2011) 20 A.3d 402, 415 ["when a victim's state-of-mind hearsay statements are relevant to show the declarant's own conduct, and when such conduct is known or probably known to the defendant, it also can give rise to motive, and the statements become admissible for that purpose"]; *Jones v. State* (Del. 2002) 798 A.2d 1013, 1016-1017 [same]; *People v. Fisher* (Mich. 1995) 537 N.W.2d 577, 582-583 [same]; *People v. Gladney* (Colo. 1977) 570 P.2d 231, 233 [same].) We caution, however, that those statements that go no further than to indicate the victim's fear of the defendant, even if known by a defendant, generally cannot be admissible unless they have some relevant effect on the defendant's behavior. (See *Ruiz*, *supra*, 44 Cal.3d at p. 608; see also *Qualls*, *supra*, 680 N.E.2d at p. 65 ["A murder victim's statement that he feared the defendant, even if made known to the defendant, sheds no light on whether the defendant had a motive to kill him, and therefore is not admissible in the defendant's trial for murder"].) In *Simpson*, the victim's statements of fear regarding the defendant were relevant only in that they tended to explain her rejection of the defendant, which, in turn, was relevant to his motivation in the killings. In *Jablonski*, the defendant's knowledge that one of his intended victims feared him was relevant to how the defendant predeliberated his ambush of the victims. In the present case, not only did the victim's statements of fear regarding defendant tend to explain her rejection of him and supply a motive for defendant to murder her, but they also were relevant to defendant's intent to stalk her and his plan to ambush her at home.

81

Accordingly, because independent evidence established that defendant was aware of Connie's state of mind and may have been motivated by it, the trial court did not abuse its discretion by concluding that Connie's statements concerning her fear of defendant, and her actions in conformity therewith, satisfied the threshold for relevance.

### 4. Trustworthiness

Defendant contends the evidence of Connie's statements was unreliable and lacked trustworthiness, and therefore was inadmissible under Evidence Code section 1252.[31] More particularly, he argues that Marilyn Young's descriptions of Connie's statements were unreliable because they were based on multiple hearsay, and that Mike Navarro's descriptions of Connie's statements were unreliable because he had a motive to blame defendant for the killings. Defendant did not raise this contention in the trial court, and therefore has forfeited this challenge. In any event, defendant misconceives the trustworthiness requirement.

Statements that are otherwise admissible under Evidence Code section 1250 may be rendered inadmissible by the trustworthiness requirement of Evidence Code section 1252, but this requirement applies "to the statement made by the hearsay declarant . . . not to the testimony of the witness who relates the hearsay statement to the trier of fact." (*People v. Spencer*, *supra*, 71 Cal.2d at p. 946, italics omitted; see also *People v. Cudjo* (1993) 6 Cal.4th 585, 608-609.) Accordingly, defendant's attacks on the reliability of Marilyn Young's and Mike Navarro's descriptions are inapt.

---

[31] Evidence Code section 1252 states: "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."

In any event, to withstand scrutiny under Evidence Code section 1252, a declarant's statements "must be made in a natural manner, and not under circumstances of suspicion, so that they carry the probability of trustworthiness. Such declarations are admissible only when they are ' "made at a time when there was no motive to deceive." ' " (*People v. Edwards* (1991) 54 Cal.3d 787, 820, quoting *People v. Howard* (1988) 44 Cal.3d 375, 405.) In the present case, the vast majority of Connie's statements were made to her friends and family under circumstances that showed she was seeking their help, and she was not seeking to deceive anyone. None of her statements were made to law enforcement or other persons to whom there may have been an incentive to lie or exaggerate. Connie's draft letter, which described her fears, was addressed to defendant, and there was no indication she intended anyone except him to see it. The only possible exception was Connie's audio-recorded statement to an unidentified female about obtaining a restraining order, but because Connie did not identify defendant by name and explained that defendant had never actually threatened her with physical harm, this statement does not appear contrived. Finally, Connie's statements of fear were not unfounded and were corroborated by her conduct, directly observed by Marilyn Young, Mike and David Navarro, Craig Spencer, and George Hoefer. Under the circumstances, nothing raised a doubt regarding the trustworthiness of Connie's statements to others insofar as they related to her fear of defendant and her conduct in conformity with that fear.

5. *Failure to give limiting instructions for nonhearsay evidence admitted to establish Connie's state of mind*

We further conclude that, in the absence of any request by the defense, the trial court did not err by failing to give, on its own motion, an appropriate limiting instruction concerning some of Connie's statements that described or assessed

83

defendant's conduct.  To understand the nature of the issue presented, we must carefully analyze Connie's statements.

Connie's statements comprised two different categories with two different theories of admissibility — statements that were admissible as hearsay under Evidence Code section 1250, and statements that were nonhearsay.  (See *People v. Ortiz* (1995) 38 Cal.App.4th 377, 389 [noting that "[i]t is important to clearly distinguish these two theories"].)

In the hearsay category of statements were Connie's direct declarations of her state of mind — e.g., "I am afraid of [defendant]."  Although these statements were hearsay, they were admissible under the hearsay exception of Evidence Code section 1250 to prove the truth of the matters asserted.  Connie's statements that she was "terrified" of defendant, and statements in her letter in which she described her fear of hearing the telephone ring and other noises in her home were hearsay evidence because they were offered to prove the truth of the matters asserted — that she feared defendant and had become fearful of noises inside her home.  If the declarant's state of mind is directly relevant to a disputed matter in the case, such hearsay statements will generally pose little danger of undue prejudice.

In the nonhearsay category of statements were Connie's indirect declarations of her state of mind, because they contained descriptions or assessments of defendant's conduct that engendered Connie's fear or altered her conduct — e.g., "[Defendant] kidnapped me at gunpoint."  These statements were not hearsay to the extent they were admitted to prove circumstantially Connie's state of mind or conduct, and not to prove the truth of matters asserted regarding defendant's conduct.  (Evid. Code, § 1250, subd. (b) ["This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed"]; see *People v. Green*, *supra*, 27 Cal.3d at p. 23, fn. 9.)

84

This nonhearsay category of statements presents an elevated danger of prejudice if the jury is unable to distinguish between the truth of the matters asserted and the inferences concerning the declarant's state of mind. (See *People v. Ortiz*, *supra*, 38 Cal.App.4th at pp. 389-390.)

Prior to the enactment of the Evidence Code, we stated that a victim's statements of fear referring to a defendant's *past* conduct are so prejudicial that no limiting instruction could ever sufficiently cure the potential undue prejudice posed by such nonhearsay evidence. "This is so because to try and separate state of mind from the truth of the charges is an almost impossible task." (*People v. Hamilton* (1961) 55 Cal.2d 881, 894 (*Hamilton*).) We held that such statements could be admitted only if they describe "threats as to future conduct on the part of the accused" and "when they show primarily the then state of mind of the declarant and not the state of mind of the accused." (*Id.* at p. 893.)

The enactment, however, of Evidence Code sections 1250 and 1252 and the comments of the California Law Revision Commission and the Assembly Committee on the Judiciary concerning those sections specifically repudiate *Hamilton*'s restrictions on the admission of evidence of a victim's fear of the accused. (See *People v. Ortiz*, *supra*, 38 Cal.App.4th at pp. 385-389.) As Evidence Code section 1252 was being enacted, the commission recognized the limitations previously established in *Hamilton*, but characterized them as "confusing and contradictory," and explained that *Hamilton*'s "additional limitations are unnecessary" because the new Evidence Code provisions "make it clear that statements of a declarant's past state of mind may be used to prove only that state of mind and no other fact." (Cal. Law Revision Com. com., reprinted at West's Ann. Evid. Code, *supra*, foll. § 1252, p. 304.) The commission further noted that trial courts should utilize Evidence Code section 352 to address any dangers arising from the potential misuse of such evidence. (Cal. Law Revision

85

Com. com., *supra,* foll. § 1252, p. 304.) "The Evidence Code does not freeze the courts to the arbitrary and contradictory standards mentioned in the *Hamilton* case for determining when prejudicial effect outweighs probative value." (*Ibid*.)

In addition, the Assembly Committee on the Judiciary's comments concerning Evidence Code section 1250 make clear its view that a limiting instruction can mitigate the concerns described in *Hamilton*. According to the Assembly committee nonhearsay evidence of a victim's fear may be admitted "because it is not offered to prove the truth of the matter stated." (Assem. Com. on Judiciary com., reprinted at West's Ann. Evid. Code, *supra,* foll. § 1250, p. 281.) The committee cautioned: "This limitation is necessary to preserve the hearsay rule," because, "[i]f the evidence of that state of mind — the statement of memory — were admissible to show that the fact remembered or believed actually occurred, any statement narrating a past event would be, by a process of circuitous reasoning, admissible to prove that the event occurred." (*Ibid*.) Thus, the Legislature rejected the notion that, for this kind of nonhearsay, it is *always* "impossible for the jury to separate the state of mind of the declarant from the truth of the facts contained in the declarations." (*Hamilton*, *supra*, 55 Cal.2d at p. 895.)

We give the California Law Revision Commission comments "substantial weight" in construing the Evidence Code (*HLC Properties, Ltd. v. Superior Court* (2005) 35 Cal.4th 54, 62), and we agree that *People v. Ortiz* correctly concluded that the Legislature's enactment of Evidence Code sections 1250 and 1252 abrogated *Hamilton*'s prohibition against references to past conduct. (See *People v. Ortiz, supra*, 38 Cal.App.4th at pp. 385-389; *Simpson*, *supra*, 86 Cal.App.4th at

86

p. 598.)  *Hamilton*'s blanket prohibition against references to past conduct is no longer required in light of the trustworthiness requirements of Evidence Code section 1252 and the balancing test of section 352.[32]

Further, we disagree with defendant that such evidence must always be accompanied by a limiting instruction, even in the absence of a request.  The trial court did not err in failing to give such a limiting instruction on its own motion.

Generally speaking, absent a request, the trial court has no duty to give an instruction limiting the purpose for which evidence may be considered.  (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1134; see also *People v. Alvarez* (1996) 14 Cal.4th 155, 214-216 [applying the same rule to state of mind evidence but without referring to the explicit restrictions of Evid. Code, § 1250].)  Although the Assembly Committee on the Judiciary's comments declare that statements admitted under Evidence Code section 1250 cannot be used "to show that the fact remembered or believed actually occurred" (Assem. Com. on Judiciary com., reprinted at West's Ann. Evid. Code, *supra*, foll. § 1250, p. 281) or "as a basis for inferring that the alleged threatener must have made threats," and that such uses constitute "inadmissible hearsay evidence" (*id.*, p. 282), such admonitions do not generate a categorical duty on the part of the trial court to give limiting instructions consistent with these comments.  Evidence Code section 355 provides:  "When evidence is admissible . . . for one purpose and is inadmissible

---

[32]    Despite these legislative pronouncements, a few of our recent cases have continued to invoke the reasoning of *Hamilton*, and they are also disapproved on this point.  (See *People v. Griffin* (2004) 33 Cal.4th 536, 579; *People v. Hernandez, supra,* 30 Cal.4th at p. 876; *People v. Coleman* (1985) 38 Cal.3d 69, 84-86.)

. . . for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Italics added.)

We see no reason to deviate from this codified practice when a victim's statement, admissible under Evidence Code section 1250, describes the defendant's conduct. Given the rules of relevancy, the trustworthiness requirements of Evidence Code section 1252, and the balancing required by Evidence Code section 352, we presume that trial courts will appropriately screen the value of such evidence in light of the evidentiary problems that may stem from its admission. If a statement bears little relevance or trustworthiness, or presents significant danger of prejudice by describing a defendant's conduct, a trial court presumably will refuse to admit such evidence of the victim's state of mind. Additionally, if the evidence nonetheless passes such scrutiny, there may be situations in which the decision to seek a limiting instruction is best left to defense counsel's discretion in order to evaluate whether the risk of such an instruction highlighting the defendant's conduct outweighs any benefit the instruction may provide.

Accordingly, in the absence of a request by the defense, the trial court did not err by failing to instruct the jury that Connie's statements, which were relevant as circumstantial evidence of her state of mind, were not admissible to show that the facts remembered or believed had actually occurred.

### 6. *Prejudice*

As noted *ante*, in part III.C.1., based on the representations of the prosecutor before trial, the trial court explicitly ruled that the following three pieces of evidence were admissible: Connie's statement that she decided to change her locks, her inquiry about obtaining a restraining order, and the letter she addressed to defendant. Although the trial court did not specifically rule on the

admissibility of the remainder of Connie's statements, we conclude, based on the entire record, it is not reasonably probable that defendant's guilt verdict was affected by any evidentiary error.

### a. Statements that the trial court specifically ruled were admissible

We will first review under an abuse of discretion standard whether the trial court correctly concluded, pursuant to Evidence Code section 352, that the probative value of the first three pieces of evidence "was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice." (*People v. Scheid* (1997) 16 Cal.4th 1, 13.)  As explained below, we conclude that generally the court did not abuse its discretion under Evidence Code section 352 concerning these statements, and that any error was not prejudicial.

Addressing first the evidence of Connie's entry in her day planner to change her locks, this evidence was clearly relevant to show her state of mind: that she intended to end her relationship with defendant; that he was no longer welcome in her home, and that she attempted to prevent defendant from freely entering.  It was also highly relevant to show defendant's motives in breaking into her condominium, and to explain his statement, made shortly before the killings, that no locks could keep him out of her home.  The probative value of this evidence outweighed any risk of undue prejudice, and the trial court did not abuse its discretion in finding this evidence admissible.

Connie's inquiry about obtaining a restraining order was relevant to show Connie's escalating concerns regarding defendant's behavior, particularly in the days leading to her death.  Her inquiry also reinforced the other evidence showing that Connie still feared defendant right before her death.  Any risk of prejudice from this evidence was mitigated by the circumstances that Connie did not

89

mention defendant's name, made clear the individual had not physically threatened her, and gave no detailed description of the individual's conduct. The probative value of this evidence, therefore, outweighed any risk of undue prejudice, and the trial court did not abuse its discretion in finding this evidence admissible.

Finally, Connie's letter to defendant poses a slightly more complicated analysis because it contains a mixture of hearsay and nonhearsay statements of her state of mind. For example, she wrote that she felt afraid of defendant and had become fearful of otherwise routine noises within her own home. She also described her prior affectionate feelings toward defendant. These statements were directly probative of her state of mind, and carried little potential to cause undue prejudice to defendant because Connie described only her general fear of defendant and did not identify any instance in which defendant was the cause of noises within her home. Therefore, the trial court did not abuse its discretion in admitting these statements.

The same letter, however, contained several nonhearsay statements that were relevant only as circumstantial evidence of Connie's fear and her actions in conformity therewith. Connie wrote she suspected that all of the hang-up telephone calls were from defendant, and that she believed defendant was "so angry" and felt the need for "venge[a]nce and punishment." Connie wrote that she and defendant had both come from "abandoned childhoods," but defendant had been unable to "make some changes" in his life, and she could not help him do so.

Her statements regarding her belief as to defendant's hang-up telephone calls and his anger were strong circumstantial evidence of Connie's fearful state of mind. In addition, because the statements were clearly speculative as to defendant's involvement in the hang-up telephone calls and the statements did not otherwise describe defendant's conduct in any significant detail, they did not carry

90

significant risk of undue prejudice. Therefore, the probative value of these statements outweighed any risk of undue prejudice, and the trial court properly admitted them.

Last, that defendant had come from an "abandoned" childhood or was unable to make changes in his life was not relevant to Connie's fear of defendant, or any other issue in the case, and that evidence should not have been admitted. But even assuming the jury believed such statements, these vague assertions could hardly have been prejudicial.

In summary, the trial court did not abuse its discretion in admitting most of the statements identified before trial, and defendant fails to demonstrate prejudice under either state law or the federal Constitution. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836 [state law error requires reversal only if it is reasonably probable that the error had an effect on the verdict]; *Chapman v. California* (1967) 386 U.S. 18, 24 [reversal is required under the federal Constitution unless the error was harmless beyond a reasonable doubt].)[33]

---

[33] Even assuming, for sake of argument, that Connie's telephone call regarding the restraining order was made to law enforcement, or a related entity, and therefore might be deemed "testimonial" and implicate error under the federal Constitution (*Crawford v. Washington*, *supra*, 541 U.S. at p. 51), we further conclude that defendant forfeited his claims under the Sixth Amendment's confrontation clause. Defendant voiced no objection based upon the confrontation clause or due process, and expressed his objections purely on state law grounds, specifically arguing that the evidence was not relevant and was prejudicial under the Evidence Code. These objections "presented legal issues different from those underlying an objection that the admission of testimony would violate the confrontation clause" and, therefore, did not preserve his Sixth Amendment claim. (*People v. Redd, supra,* 48 Cal.4th at p. 732, fn. 19.) As to Connie's other statements, they were made to her friends and family and not to any government officers under formalized circumstances that were "testimonial" within the meaning of *Crawford*. (*Crawford v. Washington*, *supra*, at p. 51 ["An accuser

*Footnote continued on next page*

### b. Statements admitted without a trial court ruling

As described *ante*, in part III.C.1., in light of the prosecutor's assurances before trial, the trial court did not have the opportunity to make specific rulings concerning the admissibility of the remaining statements admitted to prove Connie's fear of defendant, her fear of staying at home, and her conduct in conformity with those fears. But even assuming defendant was not required to lodge fresh objections to these statements as they were admitted during trial (see *ante*, fn. 27), he fails to demonstrate that it is reasonably probable his verdict was affected by any evidentiary error.[34] (*People v. Cudjo, supra,* 6 Cal.4th at p. 611.) As explained *post*, these statements could not have prejudiced defendant because the assertions within them were either proved by other admissible evidence, the assertions were facially speculative, or the described conduct was cumulative to other properly admitted evidence detailing incidents of defendant's stalking.

Although many of Connie's statements concerning her fears and her conduct in conformity with her fears included her beliefs and assertions of defendant's conduct, several of these beliefs and assertions were proved by other admissible evidence. Among these statements were allegations that defendant had

---

*Footnote continued from previous page*

who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."].) We also reject, as we have before, the contention that the hearsay exception for state of mind is not a firmly rooted hearsay exception and that such statements are unreliable. (*People v. Majors* (1998) 18 Cal.4th 385, 405.)

[34] Because the trial court was not asked to exercise its discretion in determining the admissibility of these particular statements, we have no occasion to decide whether the trial court abused its discretion under Evidence Code section 352, and consider only whether any error was prejudicial. (See *People v. Page* (2008) 44 Cal.4th 1, 41.)

been following Connie, had repeatedly broken into her home while she was away, had disabled her alarm, and had broken into her home through a skylight.

Several percipient witnesses saw defendant following Connie or showing up uninvited at various occasions. In addition, defendant's telephone calls to George Hoefer revealed that defendant had a jealous interest in following Connie. Connie's belief that defendant had broken into her condominium was verified by her son's direct observation of defendant breaking in and defendant's assertion that no locks could keep him out of her home. Defendant also took responsibility for disabling her alarm system. Finally, Connie's belief that defendant had broken into her home through a skylight was verified by his admission to Samuel Sabatino. Because the prosecutor presented compelling admissible evidence that proved the truth of Connie's assertions, the admission of these statements could not have been unduly prejudicial, even if the jury construed them for the truth of the matters stated.

With respect to Connie's statements that were not directly corroborated by admissible evidence, we conclude that (1) some of the statements could not have been prejudicial, because they were inherently and obviously speculative; and (2) the remaining statements were not prejudicial because they were cumulative to other evidence that overwhelming established defendant's guilt.

Connie's belief that defendant would be angry on what turned out to be the weekend before the killings was based partly upon the prediction of an astrologer and merely predicted defendant's *future* behavior. Connie's belief that defendant had hidden in a closet while Connie and her son briefly retrieved clothing from the condominium was based on a secondhand source, Donnie Clapp, without Connie's firsthand knowledge. Consequently, the jury likely would have considered these statements from Connie based on secondhand information to show only why Connie was afraid to stay at home, particularly in the last week before the killings.

93

Accordingly, defendant suffered little or no prejudice from the admission of these statements.

Connie's other uncorroborated statements that were not speculative, however, may have been accepted by the jury as evidence of truth of the matters stated. These included Connie's statements that defendant had broken into her condominium and forced her to sleep with him, disabled her car and approached her in a parking garage, and kidnapped her at gunpoint for a weekend.[35] Nonetheless, this evidence was cumulative to the properly admitted evidence concerning defendant's stalking and victimization of Connie.

Evidence of defendant's motive was supplied by Connie's rejection of him, followed by his numerous acts of stalking her and inciting her fear. The incident described by George Hoefer, in particular, showed that defendant was not only unwilling to let Connie begin a relationship with another man, but would go to great lengths to prevent it.

Evidence that defendant premeditated Connie's death included the incident in which defendant armed himself, broke into Connie's home with a firearm, attempted to conceal his break-in, hid the firearm, and handcuffed David Navarro, but ultimately was deterred by David's presence. Defendant admitted to Sabatino that he was contemplating killing Connie. On the Wednesday before the murders, defendant admitted he knew Connie was not staying at home, and he assured her

---

[35] There was some circumstantial corroboration of Connie's statements concerning the weekend she alleged defendant kidnapped her. Marilyn Young testified that she was surprised not to find Connie when she arrived to pick her up, and she later received a telephone call from Connie in which she explained that she was with defendant in a motel room, but Connie "sounded nervous." This evidence, however, by itself, did not prove that defendant had kidnapped Connie at gunpoint.

94

he would leave her alone, presumably to allay her fears so she would return to her condominium.

Finally, evidence that defendant was the perpetrator is supplied by the circumstances that defendant was armed and upset on the night of the killings, and that he was near the location of the killings shortly before they occurred. Defendant's fingerprint was found outside the linen closet into which Connie's body had been placed. Defendant's immediate flight from the state, abandoning his possessions, his facial plastic surgery, and his later admissions also left little doubt that he was the perpetrator.

Under these circumstances, and the testimony of the percipient witnesses to his stalking of Connie, the erroneous admission of hearsay did not create a reasonable probability that defendant would have received a more favorable result in the absence of the error. (*People v. Reed* (1996) 13 Cal.4th 217, 231; *People v. Watson, supra,* 46 Cal. 2d at pp. 836-837.)

## D. Defendant's Admission of Guilt to His Father

Defendant contends the trial court erred by admitting evidence that he had confessed guilt to his father, Pat Riccardi, who had died by the time of trial. He claims the statements did not come within any applicable hearsay exception, lacked reliability, and that their admission violated his state and federal rights to confront witnesses and to due process. We disagree.

Just before opening statements, the prosecutor gave counsel a copy of a declaration of defendant's stepmother, Rosemary Riccardi made by telephone one week earlier. In that statement, she described a telephone call from defendant to his father in March 1983, after which Pat Riccardi appeared visibly upset and claimed that defendant had confessed to killing "two girls." Later, midtrial,

95

Rosemary Riccardi appeared for a hearing pursuant to Evidence Code section 402 to determine, outside the presence of the jury, the admissibility of her testimony.

At the hearing, Rosemary recalled receiving a telephone call from defendant late at night in which he urgently asked to speak with his father. Rosemary woke up Pat, gave him the telephone, and left the room. Approximately 15 minutes later, she noticed that their conversation was over, and returned to the bedroom. She found Pat sitting on the edge of the bed crying, something she had never seen Pat do in the 23 years she had known him. Pat had difficulty speaking for a few minutes, but he eventually said that defendant had "killed two girls." Pat explained that defendant had "shot them" after going to his girlfriend's apartment and finding her and her friend there.

On cross-examination at the hearing, Rosemary made equivocal statements about her interest in writing a book about defendant. She admitted that Pat disagreed with her belief that defendant should turn himself in, and that this disagreement severely strained their marriage. She also claimed she had previously told the FBI about defendant's confession to Pat on at least two occasions, the first being in 1983. The prosecutor offered to stipulate that no FBI report mentioned Rosemary stating that defendant had confessed to the crimes to his father.

The prosecutor argued that defendant's hearsay statements to his father were admissible as admissions or confessions, and that his father's statements to Rosemary were admissible as excited utterances. Defense counsel argued that Rosemary's and Pat's statements were inadmissible hearsay, because there was no indication Pat was actually repeating a statement made by defendant, thereby precluding a finding that Pat's statement reflected an admission or confession of defendant. Defense counsel also argued that the statements lacked indicia of credibility or trustworthiness, especially given Rosemary's conflicting motives

96

and the lack of any FBI corroboration that she had previously disclosed the confession. Finally, defense counsel asserted that defendant's right to confrontation would be violated, given that his father was no longer alive to testify and verify the accuracy of Rosemary's claims.

The trial court ruled that the statements were admissible as an admission by defendant and as a spontaneous statement by Pat. The court also concluded the statements met the elements of trustworthiness and reliability. At trial, Rosemary gave testimony similar to her testimony at the Evidence Code section 402 hearing. The defense presented the testimony of FBI Agent Gary Steger, who had reviewed the agency's files concerning this case and found no mention of defendant's confession to his father, despite the agency's having had 27 contacts with Rosemary between 1985 and 1986 alone. Defendant renews the claims he raised below.

"The admission of multiple hearsay is permissible where each hearsay level falls within a hearsay exception." (*People v. Williams* (1997) 16 Cal.4th 153, 199, fn. 3, citing Evid. Code, § 1201.) On appeal, determination of preliminary facts by the trial court made in the course of deciding the admissibility of hearsay evidence will be upheld if supported by substantial evidence. (*People v. Brown, supra,* 31 Cal.4th at pp. 540-541, citing *People v. Phillips* (2000) 22 Cal.4th 226, 236.) As explained below, substantial evidence supports the trial court's conclusion that at the first level the statements were admissible as a party admission because defendant confessed the crimes to his father, and at the second level the statements were admissible as a spontaneous statement, because Pat related defendant's admissions to Rosemary under the stress of learning his son had killed two girls.

97

### 1. Statements of a party

"Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ." (Evid. Code, § 1220.) Defendant notes that Pat did not repeat defendant's statements verbatim, and speculates that Pat had merely offered his opinion to Rosemary about defendant's culpability. We have long recognized that, in this context, persons are often unable " ' "to state the exact language of an admission." ' " (*People v. Ford* (1964) 60 Cal.2d 772, 800, quoting *People v. Bemis* (1949) 33 Cal.2d 395, 399.) This recognition, however, does not automatically render any statements of a party inadmissible, but instead merely goes to the weight of such evidence. Accordingly, when there is some doubt as to the exact wording of a party's statement, we require an instruction to advise jurors to view such statements with caution. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1200.)

Here, Pat received an urgent late-night telephone call from his son and had a 15-minute conversation with him. After the conclusion of that conversation, Pat reported that his son had shot his girlfriend and her friend. Under the circumstances, Pat clearly was repeating the substance of what defendant had told him. That Pat provided a succinct summary of his 15-minute conversation rather than a verbatim recounting did not render the statements inadmissible. In addition, the trial court properly warned the jury to weigh whether defendant had actually made the admission, and to view defendant's admissions with caution. (CALJIC No. 2.71.) Accordingly, the court properly concluded the statement came within the hearsay exception for the statements of a party.

### 2. Spontaneous statements

"A statement may be admitted, though hearsay, if it describes an act witnessed by the declarant and '[w]as made spontaneously while the declarant was under the stress of excitement caused by' witnessing the event. (Evid. Code,

98

§ 1240.) ' "To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been [made] before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." ' " (*People v. Gutierrez, supra,* 45 Cal.4th at pp. 809-810, quoting *People v. Poggi* (1988) 45 Cal.3d 306, 318.)

Defendant contends Pat's statements to Rosemary do not qualify as spontaneous statements because minutes had elapsed between his telephone call and his statement to her, and because he made statements only in response to her questioning. Neither the passage of time nor Rosemary's questioning precluded the trial court from finding that Pat was still under the stress of the excitement. The evidence clearly showed that Pat had difficulty talking when speaking to Rosemary. Thus, Rosemary's description of his demeanor provided substantial evidence establishing the preliminary fact that Pat was still under the stress of learning that his son had killed two girls. (See *People v. Brown, supra,* 31 Cal.4th at p. 541 [statement made two and one-half hours after the stressful event was still spontaneous].) Moreover, Rosemary's question merely asked why Pat was crying, was simple and nonsuggestive, and could not have deprived Pat's statements of their spontaneity. (*People v. Poggi, supra,* 45 Cal.3d 306, 319-320.) Accordingly, the trial court properly concluded Pat's statement came within the hearsay exception for a spontaneous statement.

99

### 3. Trustworthiness and reliability under the Sixth Amendment

We reject defendant's claim that the statements were "testimonial" within the meaning of *Crawford*. Pat's statements were made to his wife and not to any government officers under formalized circumstances that were "testimonial." (*Crawford v. Washington*, *supra*, 541 U.S. at p. 51.)[36]

In addition, defendant's challenge to the reliability and trustworthiness of these statements is inapt because his challenge is directed against Rosemary's credibility. Thus, defendant again makes the mistake of questioning the reliability of the witness who testifies about the hearsay statement instead of examining the circumstances surrounding the declarant's making of the statements. (*People v. Spencer*, *supra*, 71 Cal.2d at p. 946.) In any event, defendant had ample opportunity to confront Rosemary's truthfulness, and the jury could properly make its own determination of her credibility.

Here, there were no circumstances that would raise any doubt concerning Pat's statements. As defendant admitted at trial, he was close to his father; thus, it was not inconceivable that defendant would confide in Pat. The fact that Pat thereafter helped store and sell items that defendant had abandoned in California tended to show that he was aware his son was a suspect in the crimes at issue in their case. Finally, it was not inconceivable that Pat would share his shock with

---

[36]    We also reject defendant's contentions, made before the high court decided *Crawford*, that admissions and spontaneous statements are not firmly rooted hearsay exceptions, which carry sufficient indicia of reliability to satisfy the Sixth Amendment's confrontation clause. (*People v. Silva* (1988) 45 Ca1.3d 604, 624 [admissions are a firmly rooted exception to the hearsay rule]; *People v. Dennis* (1998) 17 Cal.4th 468, 529 [spontaneous statements are a firmly rooted exception to the hearsay rule].)

his wife, especially immediately after listening to his son admit to killing "two girls."

Accordingly, the trial court did not abuse its discretion in determining that the statements bore sufficient indicia of reliability and trustworthiness. (See *People v. Frierson* (1991) 53 Cal.3d 730, 745.) The court properly admitted defendant's admissions and Pat's spontaneous statements.

### E. The Effect of the O.J. Simpson Media Coverage

Defendant claims the media coverage of the homicides involved in the O.J. Simpson case affected his right to a fair trial and due process, because his trial began just after Simpson was arrested for the killings in that case, and the circumstances of those homicides were allegedly similar to the allegations against him. He asserts his jury was affected by this media coverage, and that the jurors impressions of that case "would be carried over unconsciously and used in [the jurors'] evaluation of the evidence against" defendant. Accordingly, defendant contends the trial court erred in denying his repeated requests, before and during trial, to continue the trial until media coverage of the Simpson case waned.

A trial court is vested with broad discretion in determining whether to grant a motion for a continuance, and we review any denial for abuse of discretion. (*People v. Sakarias, supra,* 22 Cal.4th at pp. 646-647.) "Denial of what is essentially a motion for a continuance, when no good cause is demonstrated, is not an abuse of discretion." (*People v. Davenport* (1995) 11 Cal.4th 1171, 1196; § 1050.) Here, defendant's showing of good cause rested completely on speculation. (*People v. Doolin* (2009) 45 Cal.4th 390, 451 [vague and speculative reasons do not constitute a showing of good cause].) Defendant argued before the trial court that press coverage of the O.J. Simpson case caused the community to be "worked up into a frenzy" and set into a "lynch mob mentality," and

engendered the prospect of "trial by newspaper." But at no point did defendant provide the trial court with evidence showing that any juror was actually biased against him or considered evidence presented outside of trial as a result of the publicity concerning the O.J. Simpson case.

Moreover, defendant fails to show a substantial likelihood of prejudice flowing from the denial of the requests for continuance. None of the publicity in the O.J. Simpson case mentioned defendant's case or otherwise related to his own guilt or innocence. The newspaper articles defendant submitted with his motion for continuance merely convey the circumstances of the killings, Simpson's celebrity status, his attendance at his ex-wife's funeral, suspicions of his involvement in the killings, his attempt to flee in a slow-speed vehicle chase, his threats to commit suicide, and his subsequent arrest. The articles contain no allegations that Simpson stalked his ex-wife, and only one article briefly discussed their prior marital discord.

Thus, the two cases were only superficially similar. The infamy surrounding the O.J. Simpson case largely centered around the allegation that a former professional athlete, actor, and television personality had killed his ex-wife and her friend. None of these circumstances were present here. Moreover, unlike Simpson, defendant was not a celebrity, did not have a long history of physically assaulting Connie, had a three-month pattern of stalking Connie, and fled under completely different circumstances. Therefore, assuming the jurors were following the media coverage of the O.J. Simpson case, this publicity would not have been an improper influence.

In addition to the newspaper articles, defendant submitted to the trial court eight declarations from three local criminal defense attorneys expressing their concern about the fairness of defendant's trial in light of the O.J. Simpson media coverage. These declarations engage in the same speculation defendant repeats on

appeal. More importantly, defendant had ample opportunity during voir dire to question jurors about the effect of their exposure to the O.J. Simpson press coverage, but he did not do so. Instead, defendant would have us divine prejudice when he failed to develop a record to support his claim.

Assuming any of the jurors were exposed to the publicity surrounding the O.J. Simpson case during this trial, there was no substantial likelihood that they were actually biased against defendant by that media coverage or that they could not decide a verdict based solely on the evidence presented at trial. (See *People v. Cruz* (2008) 44 Cal.4th 636, 686-688.) The trial court properly denied defendant's motions for a continuance.

### F. Cumulative Error

Defendant argues that reversal of his conviction is necessary because of the cumulative effect of errors in the guilt phase of his trial. At the guilt phase, the errors we have identified are the admission of the entire audio-recorded police interview of Marilyn Young, the admission of Connie's letter about defendant's abandoned childhood and his inability to make changes, and the failure of the trial court to give a limiting instruction concerning the nonhearsay purpose of Connie's various statements. We concluded that these statements either duplicated other admissible evidence or could not have been prejudicial in light of the overwhelming evidence of defendant's guilt. Considered cumulatively, the errors described above could not have prejudiced defendant at the guilt phase.

## IV. SPECIAL CIRCUMSTANCES ISSUES

### A. Burglary Special Circumstance

Defendant contends there was insufficient evidence to support the burglary special-circumstance finding because the evidence showed the burglary was merely incidental to the murder rather than committed with an independent

103

purpose.[37]  Defendant also contends the trial court did not properly instruct the jury concerning this special circumstance, and instead gave an erroneous instruction to the jury concerning a nonexistent special circumstance of theft.  We agree that the trial court did not properly instruct the jury and that the burglary special-circumstance finding must be reversed.  Accordingly, we need not reach defendant's claim regarding the sufficiency of the evidence for this special circumstance.

### 1.  The "merely incidental" rule

Pursuant to our decision in *People v. Green*, *supra*, 27 Cal.3d 1, a felony-murder special circumstance is inapplicable if the underlying felony is merely "incidental" or "ancillary" to the murder; instead, the evidence must demonstrate an independent or concurrent felonious purpose distinct from any intent to kill.  (*Id.* at p. 61; accord, *People v. Abilez* (2007) 41 Cal.4th 472, 511; *People v. Davis*

---

[37]  The prosecutor's theory for first degree murder was not premised on felony murder, and he argued only that the homicides were premeditated and deliberated first degree murder.  The instructions given to the jury reflect these circumstances.  This case, therefore, presents no issue concerning merger of the burglary and the homicide for purposes of setting the offense as a murder in the first degree.  (*People v. Wilson* (1969) 1 Cal.3d 431, 440 [merger rule prohibits setting murder as first degree when defendant committed burglary solely with the intent to assault the victim inside]; but see *People v. Farley* (2009) 46 Cal.4th 1053, 1121 [overruling *Wilson*'s first degree felony-murder merger rule but making clear the overruling of *Wilson* does not apply retroactively].)  The Attorney General, however, urges us to ascertain the relevance of the *Wilson* rule here because, in prior cases, we have suggested that the merger rule is either similar or identical to the "merely incidental" rule for special circumstances.  (*People v. Seaton* (2001) 26 Cal.4th 598, 646; *People v. Sanders* (1990) 51 Cal.3d 471, 509-510, 517; *People v. Garrison* (1989) 47 Cal.3d 746, 778-779, 788-789.)  We need not address this issue here because we reverse the burglary special-circumstance finding for instructional error.

(2009) 46 Cal.4th 539, 609.) Therefore, if defendant entered the condominium for the sole purpose of killing Connie, the burglary would be merely incidental to her murder, and the evidence would be insufficient to support a burglary special circumstance.

The standard jury instruction explaining this rule is CALJIC No. 8.81.17, which states, in relevant part: "To find that the special circumstance referred to in these instructions as murder in the commission of [the special-circumstance-eligible felony] is true, it must be proved: . . . [t]he murder was committed while the defendant was engaged in the commission or attempted commission of [the special-circumstance-eligible felony] and [¶] . . . [¶] [t]he murder was committed in order to carry out or advance the commission of the crime of [the special-circumstance-eligible felony]. . . . In other words, the special circumstance referred to in these instructions is not established if the [attempted] [special-circumstance-eligible felony] was merely incidental to the commission of the murder." (CALJIC No. 8.81.17.) The trial court has no duty, on its own motion, to instruct the jury with quoted portion of CALJIC No. 8.81.17 "unless the evidence supports an inference that the defendant might have intended to murder the victim without having an independent intent to commit the specified felony." (*People v. Monterroso* (2004) 34 Cal.4th 743, 767; *People v. Wilson* (2008) 43 Cal.4th 1, 18.)

### 2. *The instructions given to the jury*

The prosecution theorized that defendant broke into Connie's home with the intent to assault her, thereby committing a burglary, but their interaction escalated into a double homicide. In response, the trial court proposed modified versions of CALJIC No. 8.81.17, which specifically identified the special-

circumstance-eligible felony as burglary — and CALJIC No. 14.50, which defined burglary.

The trial court, however, instructed the jury pursuant to an erroneous modified version of CALJIC No. 8.81.17 that did not mention burglary. Instead, the modified instruction repeatedly identified the special-circumstance-eligible felony as "a theft or other felony, to wit, assault with intent to commit great bodily injury or with a deadly weapon, a handgun."[38] In defining burglary, the court instructed the jury that at the time of entry defendant must have had "the specific intent to commit the crime of a theft or other felony to wit, assault with intent to commit great bodily injury or with a deadly weapon, a handgun." The court gave the jury identical instructions in written form.

### 3. Analysis

There was evidence from which the jury could infer that defendant entered Connie's residence for the sole purpose of killing her, thereby requiring an instruction pursuant to *People v. Green*, *supra*, 27 Cal.3d 1. Defendant admitted

---

[38] In its entirety, the court instructed the jury in this respect as follows: "To find the special circumstance referred to in these instructions as murder in the commission of a theft or other felony, to wit, an assault with intent to commit great bodily injury or with a deadly weapon, a handgun, is true, it must be proved: One, the murder was committed while the defendant was engaged in the commission of a theft or other felony, to wit, assault with intent to commit great bodily injury or with a deadly weapon, a handgun. Two, the murder was committed in order to carry out or advance the commission of the crime of theft or other felony, to wit, assault with intent to commit great bodily injury or with a deadly weapon, a handgun, or to facilitate an escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the theft or other felony, to wit, assault with intent to commit great bodily injury or with a deadly weapon, a handgun, was merely incidental to the commission of the murder."

to his burglary partner that he was contemplating killing Connie. Some three weeks before the killings, he feigned the shooting of a gun at her. Two weeks before the killings, defendant armed himself, broke into Connie's home, attempted to conceal his break-in, hid a firearm, discovered David Navarro was present, and handcuffed him, but may have been deterred from killing Connie due to David's presence. Just before the killings, defendant successfully lured Connie back to her condominium, promising her and Marilyn Young that he would leave Connie alone. On the night of the homicides, defendant had a gun, was agitated and nervous, referred to Connie as "that fucking bitch," and tried to ascertain whether David was home before he left his companions. Shortly thereafter, the victims were shot.

Accordingly, because there was evidence that could have led the jury to infer that defendant entered Connie's residence for the sole purpose of killing her, the trial court had a duty to instruct the jury, on its own motion pursuant to *People v. Green*, *supra*, 27 Cal.3d 1, that the burglary special circumstance was not established if the burglary was merely incidental to the murder. (*People v. Navarette* (2003) 30 Cal.4th 458, 505.) As noted above, the trial court gave a variant of this instruction, but it did not mention burglary and, instead, mistakenly referred to theft and assault with a deadly weapon — crimes that do not constitute special circumstances.[39] (§ 190.2.) Because of the confusing nature of these instructions, the jury may not have considered whether the burglary of Connie's home was merely incidental to her murder.

---

[39] Although the instruction given referred to "other felony," in addition to theft and assault, nothing in the remaining instructions or verdict forms specifically referred to burglary as a felony.

Instructional error under *People v. Green* is reversible unless it was harmless beyond a reasonable doubt. (*People v. Prieto* (2003) 30 Cal.4th 226, 256-257; *People v. Harris* (2008) 43 Cal.4th 1269, 1299; *People v. Williams* (1988) 44 Cal.3d 883, 929.) Given the inferences that reasonably may be drawn from the circumstances described above, the evidence failed to establish "so overwhelmingly" that defendant had a felonious intent, independent of or concurrent to murder, in burglarizing Connie's home such that "the jury could not have had a reasonable doubt on the matter." (*People v. Marshall* (1997) 15 Cal.4th 1, 44.) Consequently, as we cannot conclude that the instructional error was harmless beyond a reasonable doubt, we reverse the burglary special-circumstance finding.[40] Because we reverse the burglary special circumstance on this ground and at least one valid special circumstance remains, we need not decide defendant's related contention that the burglary-murder special-circumstance finding was supported by insufficient evidence.

---

[40] The Attorney General alternatively argues that, even if defendant intended to kill Connie at the time he entered her residence, he may have been surprised by the presence of Sue Jory. According to the Attorney General, Sue's homicide, therefore, would have supported a burglary special circumstance because she was killed in the course of a burglary with the intent to murder Connie. The prosecutor, however, did not charge defendant with a burglary special circumstance *as to Sue's murder*, nor do the instructions or verdict forms indicate that the jury deliberated this issue. Instead, the instructions and verdict forms show that the jury answered only the question of whether defendant was engaged in the commission of burglary during the course of *Connie's* murder as charged in count 1. The separate verdict form for Sue's murder, count 2, lists no special circumstance for burglary; rather, it lists only the special circumstance of multiple murder.

### B.  Multiple-murder Special Circumstance

Defendant contends the trial court erred by granting the prosecutor's request, over his objection, to amend the information and the verdict forms to allege two multiple-murder special circumstances, one for each victim. Thereafter, the jury found true two multiple-murder special-circumstance allegations.

The Attorney General concedes this was error (*People v. Hardy* (1992) 2 Cal.4th 86, 191), and we, therefore, reverse one of the two multiple-murder special-circumstance findings.

## V.  PENALTY PHASE ISSUES

Defendant raises several claims of error relating to the penalty phase and to the validity of his death sentence.  We need not reach these claims, however, given our conclusion that we must reverse the penalty of death because there was error in dismissing a prospective juror under *Witherspoon*.  For this same reason, we need not address defendant's additional claim of cumulative penalty phase error.

## VI.  CONCLUSION

The burglary special-circumstance finding, one of the two multiple-murder special circumstances, and the judgment of death are reversed.  In all other respects, the judgment is affirmed.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

**CONCURRING OPINION BY CANTIL-SAKAUYE, C. J.**

We properly reverse the judgment of death based on the holding of *Gray v. Mississippi* (1987) 481 U.S. 648 (*Gray*). I write separately only to observe that the rationale for *Gray*'s rule has become somewhat unclear, and to suggest that clarification of the theory underlying the rule would provide guidance in identifying the breadth of circumstances in which the rule applies.

The general rule is that, absent a showing of prejudice, an erroneous excusal of a prospective juror for cause does not mandate the reversal of judgment. This rule is based on the principle that a "[d]efendant has a right to jurors who are qualified and competent, not to any particular juror." (*People v. Holt* (1997) 15 Cal.4th 619, 656.) But as noted in the majority opinion, under existing United States Supreme Court precedent, the erroneous excusal of a prospective juror for cause based on that person's views concerning the death penalty *automatically* compels the reversal of the penalty phase judgment without any inquiry as to whether the error may have prejudiced defendant's penalty determination. (*Gray*, *supra*, 481 U.S. at pp. 659-667 (*Gray*) (opn. of the court); *id*., at pp. 667-668 (plur. opn. of Blackmun, J.); *id*., at p. 672 (conc. opn. of Powell, J.).)

In *Gray, supra*, 481 U.S. 648, the trial court declined to excuse for cause a number of prospective jurors who expressed opposition to the death penalty, and the prosecutor exercised peremptory challenges to excuse those jurors. By the time Mrs. Bounds entered the jury box, the prosecutor had

1

exhausted the state's peremptory challenges. Although, after some confusion, the trial court concluded Mrs. Bounds was capable of voting to impose the death penalty, the prosecutor asked the court to afford the state another peremptory challenge to exercise against Mrs. Bounds, arguing that the court's prior denials of the state's challenges for cause were erroneous and thereby caused the state to prematurely exhaust its peremptory challenges. The trial court at this point expressed its belief that it had erred in denying a number of the prosecutor's prior challenges for cause, but declined to revisit those earlier rulings. It also declined to afford the prosecutor more peremptory challenges. Instead, it erroneously concluded that Mrs. Bounds was indecisive and excused her for cause. (*Gray, supra,* at pp. 651-656.)

The high court granted review to address "whether the improper excusal of a juror for cause can be harmless." (*Gray, supra*, 481 U.S. at p. 657.) In response to the contention that the erroneous excusal was harmless because the prosecutor claimed that he would have exercised a peremptory challenge against Mrs. Bounds if he had not exhausted his peremptory challenges, the majority reasoned that "[e]ven if one is to believe the prosecutor's statement that if his motion to remove [the prospective juror] for cause had been denied and he had had a peremptory remaining, he would have used it to remove her, we cannot know whether in fact he would have had this peremptory challenge left to use. That is, if the court had granted one or more of his earlier motions to remove for cause, the prosecutor may have used his peremptory challenges on other jurors whom he did not strike when he had fewer peremptory challenges to exercise. The nature of the jury selection process defies any attempt to establish that an erroneous *Witherspoon-Witt* exclusion of a juror is harmless." (*Id.* at p. 665; see *id.* at p. 670 (conc. opn. of Powell, J.).) The *Gray* majority rejected the argument that "the crucial question in the harmless-error analysis is whether a particular prospective

2

juror is excluded from the jury due to the trial court's erroneous ruling," and, instead, emphasized that "the relevant inquiry is 'whether the composition of the *jury panel as a whole* could possibly have been affected by the trial court's error.' " (*Id.* at p. 665.)

A majority in *Gray* could not agree on a response to the state's argument that the court should "treat the erroneous exclusion as an isolated incident without prejudicial effect if it cannot be said that the ultimate panel did not fairly represent the community anyway." (*Gray*, *supra*, 481 U.S. at p. 661.) According to the *plurality* opinion, the erroneous exclusion of "a scrupled, yet eligible, venire member" cannot be viewed as "an isolated incident," in part "because it appears that prosecutors often use peremptory challenges" in order "to remove all venire members who expressed any degree of hesitation against the death penalty." (*Gray*, *supra*, 481 U.S. at pp. 667-668 (plur. opn. of Blackmun, J.).) Therefore, according to the plurality in *Gray*, an erroneous *Witherspoon-Witt* excusal further slants the jury in favor of a death sentence, thereby affecting the impartiality of the panel, which "goes to the very integrity of the legal system" and implicates a defendant's "constitutional right not to be sentenced by a 'tribunal organized to return a verdict of death.' " (*Gray, supra,* at p. 668 (plur. opn. of Blackmun, J.), quoting *Witherspoon v. Illinois* (1968) 391 U.S. 510, 521; see *Wainwright v. Witt* (1985) 469 U.S. 412.)

Justice Powell supplied the fifth vote in *Gray* to constitute a majority for the application of an automatic reversal rule. But he expressly disagreed with a portion of the plurality's reasoning. Justice Powell agreed that the court could not assume that the prosecutor would have exercised a peremptory challenge against Mrs. Bounds, but he rejected the plurality's view that the prosecutor's use of peremptory challenges to remove prospective jurors who expressed hesitation concerning the death penalty was relevant to the issue of whether the erroneous

3

excusal affected the impartiality of the jury, because a prosecutor is lawfully entitled to "remove peremptorily jurors whom he believes may not be willing to impose lawful punishment." (*Gray*, *supra*, 481 U.S. at p. 671 (conc. opn. of Powell, J.).) Therefore, Justice Powell rejected the idea that the erroneous excusal "was exacerbated by the proper exclusion of other jurors who may have shared her views."[1] (*Gray,* at p. 672 (conc. opn. of Powell, J.).) Instead, Justice Powell believed the error was automatically reversible solely because "we cannot know what effect the excluded juror would have had on the panel as a whole." (*Id*. at p. 671 (conc. opn. of Powell, J.).)

Consequently, *Gray* stands for the proposition that *Witherspoon-Witt* error is reversible per se because the error affects the composition of the panel " 'as a whole' " (*Gray*, *supra*, 481 U.S. at p. 665, italics omitted; *id.* at p. 671 (conc. opn. of Powell, J.)) by inscrutably altering how the peremptory challenges were exercised (*id*. at p. 665; see *id.* at p. 670 (conc. opn. of Powell, J.)). But the *Gray* court was unable to articulate any agreement as to why a change in the composition of the panel as a whole jeopardized the defendant's right to a fair trial, and indeed five justices apparently rejected the claim that the error had the effect of leaning the jury panel in favor of a conviction and death verdict. (*Id*. at pp. 671-672 (conc. opn. of Powell, J.); *id.* at p. 679 (dis. opn. of Scalia, J.).)

---

[1] It appears that the dissenters of the *Gray* court agreed with Justice Powell on this point. Justice Scalia, in a dissent speaking for three other justices, also criticized the plurality's view that the prosecutor's use of peremptory challenges to remove life-leaning prospective jurors was relevant to *Witherspoon* error, explaining that "[s]ince defendants presumably use their peremptory challenges in the opposite fashion, the State's action simply does not result in juries 'deliberately tipped toward' conviction." (*Gray*, *supra*, 481 U.S. at p. 679 (dis. opn. of Scalia, J.).)

4

Finally, the *Gray* majority was unpersuaded by the state's argument that this *Witherspoon-Witt* error was harmless in the absence of any evidence that the error caused a biased juror to sit in judgment of defendant's case.

One year later, in *Ross v. Oklahoma* (1988) 487 U.S. 81 (*Ross*), the high court was faced with the inverse of the situation posed in *Gray* — the erroneous *inclusion*, over the defense's objection, of a prospective juror who stated on voir dire that he would *automatically* vote to impose the death penalty if he found the defendant guilty. (*Ross, supra,* at pp. 83-84.) As a result of this error, the defense used its sixth peremptory challenge to remove this prospective juror. The defense eventually exhausted its six remaining challenges, and then objected to the composition of the final jury. (*Id.* at p. 84.) On appeal, the defendant relied upon *Gray* and argued that the error unavoidably affected " 'the composition of the *jury panel as a whole*' " (*Gray*, *supra*, 481 U.S. at p. 665, original italics), thereby requiring reversal. Just as in *Gray*, the defendant argued that it was impossible to determine how the trial court's error affected the parties' exercise of their subsequent peremptory challenges because "had he used his sixth peremptory challenge differently, the prosecution may have exercised its remaining peremptory challenge differently in response, and consequently, the composition of the jury panel might have changed significantly." (*Ross*, *supra*, 487 U.S. at p. 87.)

The *Ross* majority agreed with the defendant "that the failure to remove [the prospective juror in question] may have resulted in a jury panel different from that which would otherwise have decided the case," but contrary to the majority's conclusion in *Gray*, the high court refused to "accept the argument that this possibility mandates reversal." (*Ross*, *supra*, 487 U.S. at p. 87.) Instead, the *Ross* majority declined to apply the reasoning articulated in the *Gray* court's majority opinion — that an error in ruling on a challenge for cause, which might

5

have affected the ultimate composition of the jury as a whole, always requires reversal.

The majority in *Ross* criticized the " ' "composition . . . *as a whole*" ' " language from *Gray*, stating, "We think the broad language used by the *Gray* Court is too sweeping to be applied literally," and the court limited its applicability, stating that the language "is best understood in the context of the facts there involved." (*Ross*, *supra*, 487 U.S. at pp. 87-88.) In the course of criticizing the rule articulated in *Gray*, the *Ross* majority explained that "the statement that any error which affects the composition of the jury must result in reversal defies literal application" because the remedy to correct such an error, dismissing the venire and starting jury selection anew, creates a scenario in which "the composition of the jury would undoubtedly have been affected by the original error." (*Ross, supra,* at p. 87, fn. 2.) The *Ross* majority then conducted a harmless error analysis and concluded that the error had no prejudicial effect because defendant had failed to show that an unqualified juror had been seated. (*Id.* at pp. 87-88.)

Given the high court's conclusion that the *Gray* majority's " ' "composition . . . *as a whole*" ' " language "is too sweeping to be applied literally" (*Ross*, *supra*, 487 U.S. at p. 87), and its limitation of the *Gray* holding to an improper exclusion under *Witherspoon-Witt*, it appears the *Gray* court's automatic reversal rule lacks any agreed-upon rationale for its application. The errors in *Gray* and *Ross* each created uncertainty about how the parties would have used their remaining peremptory challenges and presumably impacted the ultimate

6

composition of the jury panel.[2]  If these identical circumstances change the composition of the jury in uncertain ways in both scenarios, then why does *Gray* require automatic reversal whereas *Ross* does not?  Under this existing precedent, it does not appear to matter that *Gray* involved a prospective juror with hesitations concerning the death penalty whereas *Ross* involved a prospective juror who would automatically impose the death penalty.[3]

Ultimately, the difference between *Gray* and *Ross* perhaps boils down to a question of policy.  Arguably, the *Gray* rule, by making a single *Witherspoon-Witt* error automatically reversible, best enforces the protections

---

[2]  As the majority in *Ross* acknowledged, one "animating" concern in *Gray* was "the inability to know to a certainty whether the prosecution could and would have used a peremptory challenge to remove the erroneously excused juror" (*Ross*, *supra*, 487 U.S. at p. 88), because, according to the majority in *Gray*, this circumstance affected the composition of the jury in a manner that defies any attempt to reconstruct how the prosecution would have exercised its peremptory challenges absent the error (*Gray*, *supra*, 481 U.S. at p. 665; see *id.* at p. 670 (conc. opn. of Powell, J.)).  In his separate opinion, Justice Liu contends that this circumstance provides a ground of distinction between *Gray* and *Ross*.  But the majority in *Ross* acknowledged that the error presented before it also had the effect of altering the composition of that jury panel by affecting how the defense exercised its peremptory challenges.  (*Ross*, *supra*, at p. 87.)  Yet, despite their similar circumstances, the majority in *Ross* did not provide a reasoned basis for why *Ross* and *Gray* each require the application of a different standard of reversible error.

[3]  It is worth noting that the error in *Ross*, according to the reasoning of the *Gray* plurality, would also have tipped the jury panel in favor of a death verdict because, had the trial court properly removed the prospective juror in question, the defendant in *Ross* would not have been compelled to expend a peremptory challenge to remove that prospective juror.  This error, therefore, gave the defense one fewer peremptory challenge, thereby depriving the defense of an opportunity to remove a death-leaning prospective juror and, applying the reasoning of the *Gray* plurality, tilting the panel towards a verdict of death.

7

afforded by *Witherspoon-Witt* during the jury selection process. On the other hand, if a single *Witherspoon-Witt* error during the jury selection process is tolerable as long as the defendant is ultimately tried by 12 fair jurors, then the *Ross* harmless error rule should be utilized.

Without additional guidance from the high court as to how *Witherspoon-Witt* error should be evaluated, it is difficult to meaningfully analyze circumstances that may differ slightly from those presented in *Gray* or *Ross*. The circumstances of the error presented here — a prospective juror erroneously dismissed based only on her written questionnaire — illustrates the difficulty.

Unlike the errors in *Gray* or *Ross*, it is uncertain whether Prospective Juror N.K.'s dismissal had any effect on the composition of the jury. At the outset, N.K. might not have been one of the 57 prospective jurors called into the jury box for questioning. Furthermore, even assuming she would have been questioned in court, N.K. might have been excusable for cause within the dictates of *Witherspoon-Witt*, or she might have been dismissed for cause for reasons completely unrelated to her views on the death penalty.[4] Alternatively, N.K. may have survived any challenges for cause but might have been subsequently removed by a peremptory challenge lodged by either the prosecution or defense, also for reasons unrelated to her views on the death penalty.[5] Thus, unlike the

---

[4]  For example, Prospective Juror N.K. wrote on her questionnaire that her ability to concentrate during the trial might be affected by a prolonged absence from her job, and she wrote that she would not be willing to remain as long as necessary to reach a verdict if the trial lasted longer than projected because of her job obligations, especially if the trial lasted longer than 30 days.

[5]  Prospective Juror N.K. had been the victim of a home burglary in which the perpetrator had not been apprehended. Because the instant homicides also involved a home burglary and the evidence demonstrated that defendant was a

*Footnote continued on next page*

8

erroneously excused prospective juror in *Gray*, who had been called into the jury box after the prosecution had already exhausted its peremptory challenges (*Gray*, *supra*, 481 U.S. at p. 653), it is unclear whether the trial court's *Witherspoon-Witt* error actually prevented Prospective Juror N.K. from being seated on the jury.[6]

If the ultimate goal animating the high court's case law in this area is to strictly prohibit *any* occurrences of *Witherspoon-Witt* error, regardless of whether the error may have affected the ultimate composition of the jury, then removing N.K. due to an erroneous *Witherspoon-Witt* determination would be sufficient to justify an automatic reversal. On the other hand, if a single *Witherspoon-Witt* error during jury selection is tolerable — and especially if it is questionable whether the dismissal affected the ultimate composition of the jury — Prospective Juror N.K.'s erroneous removal would not appear to have affected the fairness of defendant's trial. Defendant voiced no objection to the composition of the final jury below and makes no argument on appeal that a biased juror sat in judgment of his case.

---

*Footnote continued from previous page*

professional burglar, it seems likely the defense would have considered exercising a peremptory challenge to remove her.

[6] These circumstances are in stark contrast to those we faced in *People v. Stewart* (2004) 33 Cal.4th 425. In that case, we concluded that responses to a defective written questionnaire had been used improperly as the basis for removing five prospective jurors for cause because of their views concerning the death penalty. (*Id.* at p. 451.) That same defective questionnaire also was used to remove another 17 prospective jurors by stipulation of the parties. (*Id.* at p. 444.) In *Stewart*, therefore, it is evident that the removal of so many prospective jurors based on a defective questionnaire did have an appreciable impact on the final composition of the jury.

9

But without a firm identification of the guiding principles that should govern our scrutiny of an erroneous dismissal of a prospective juror for cause, we are compelled to follow that precedent that is most analogous to the circumstances presented here at the possible expense of sacrificing the finality of our state's judgments.

Appellate courts around the country would certainly be assisted if the United States Supreme Court were to provide further elucidation on this important subject, but for now, we apply the automatic reversal rule under compulsion of stare decisis and *Gray*.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

BAXTER, J.
CHIN, J.
CORRIGAN, J.

10

**CONCURRING OPINION BY LIU, J.**

I write briefly in response to the Chief Justice's concurring opinion.

*Gray v. Mississippi* (1987) 481 U.S. 648 (*Gray*) was decided 11 years after *Davis v. Georgia* (1976) 429 U.S. 122, which summarily reversed a death sentence where the trial court had erroneously excluded a prospective juror for cause based on the juror's views concerning the death penalty. In *Gray*, the United States Supreme Court had the opportunity to revisit *Davis* and apply harmless error review to such erroneous exclusions. A majority of the court declined to do so, with Justice Powell casting the swing vote. (See *Gray*, at p. 661; *id.* at p. 670 (conc. opn. of Powell, J.).) Over a thorough and vigorous dissent (see *id.* at p. 672 (dis. opn. of Scalia, J.)), the five-justice majority agreed that the error required reversal because "we cannot know what effect the excluded juror would have had on the panel as a whole." (*Id.* at p. 671 (conc. opn. of Powell, J.); see *id.* at p. 665 (opn. of the court).)

One year later, after Justice Kennedy succeeded Justice Powell, the court returned to the issue of for-cause excusals of prospective jurors based on their views concerning the death penalty in *Ross v. Oklahoma* (1988) 487 U.S. 81 (*Ross*). This time, the court considered a defendant's claim that his constitutional rights were violated because he was forced to use a peremptory challenge to remove a prospective juror who should have been, but was not, excused for cause. (*Id.* at p. 83.) The defendant relied on *Gray*, particularly its statement that " 'the

1

relevant inquiry is "whether the composition of the *jury panel as a whole* could possibly have been affected by the trial court's error." ' " (*Id.* at pp. 86-87 [quoting *Gray*].)  In response, a different five-justice majority explained:  "We decline to extend the rule of *Gray* beyond its context:  the erroneous ʻ*Witherspoon* exclusion' of a qualified juror in a capital case.  We think the broad language used by the *Gray* Court is too sweeping to be applied literally, and is best understood in the context of the facts there involved.  One of the principal concerns animating the decision in *Gray* was the inability to know to a certainty whether the prosecution could and would have used a peremptory challenge to remove the erroneously excused juror.  [Citation.]  In the instant case, there is no need to speculate whether [the prospective juror] would have been removed absent the erroneous ruling by the trial court; [the prospective juror] was in fact removed and did not sit." (*Id.* at pp. 87-88, fn. omitted.)  *Ross* applied harmless error review and, finding no prejudice, sustained the death judgment.  (*Id.* at p. 91.)  The four justices who, along with Justice Powell, comprised the majority in *Gray* filed a dissent.  (*Id.* at p. 92 (dis. opn. of Marshall, J.).)

The Chief Justice says *Ross* "criticized" the rule in *Gray*.  (Conc. opn. of Cantil-Sakauye, C. J., *ante*, pp. 5, 6.)  It may well be that the five justices in the *Ross* majority — the four dissenters in *Gray* plus Justice Kennedy — believed *Gray* was wrongly decided.  But *Ross* did not disavow or overrule *Gray*.  The court simply distinguished *Gray* and declined to extend its rationale beyond situations involving an erroneous excusal for cause, where the "animating" concern is "the inability to know to a certainty whether the prosecution could and would have used a peremptory challenge to remove the erroneously excused juror." (*Ross*, *supra*, 487 U.S. at p. 88.)

The Chief Justice contends that *Gray* and *Ross* considered together lack a certain theoretical purity.  (See conc. opn. of Cantil-Sakauye, C. J., *ante*, pp. 6-7.)

2

But *Ross* itself makes explicit the ground of distinction between the two cases, and in the two and a half decades since *Gray* and *Ross* were decided, state and federal courts have dutifully applied their respective holdings without complaint and without any split of authority. There appear to be few cases where a trial court has erroneously excluded a prospective juror for cause resulting in an unknowable effect on the composition of the jury as a whole. But in the few cases where this has occurred, courts have consistently applied *Gray*. (See *People v. Stewart* (2004) 33 Cal.4th 425, 432; *People v. Heard* (2003) 31 Cal.4th 946, 951; *Szuchon v. Lehman* (3d Cir. 2001) 273 F.3d 299, 329-331; *United States v. Chanthadara* (10th Cir. 2000) 230 F.3d 1237, 1272-1273.) There are significantly more cases where a trial court has erroneously failed to exclude a prospective juror but the juror did not end up sitting on the jury. In such cases, courts have consistently applied *Ross* to find harmless error. (E.g., *People v. Farley* (2009) 46 Cal.4th 1053, 1096; *People v. Wallace* (2008) 44 Cal.4th 1032, 1056; *People v. Gordon* (1990) 50 Cal.3d 1223, 1246-1247; *Beuke v. Houk* (6th Cir. 2008) 537 F.3d 618, 638; *Soria v. Johnson* (5th Cir. 2000) 207 F.3d 232, 242-243 & fn. 12; *United States v. Nururdin* (7th Cir. 1993) 8 F.3d 1187, 1191; *Pickens v. Lockhart* (8th Cir. 1993) 4 F.3d 1446, 1450-1451; *United States v. Farmer* (11th Cir. 1991) 923 F.2d 1557, 1566; *Pursell v. Horn* (W.D. Pa. 2002) 187 F.Supp.2d 260, 322; *Ward v. State* (Ind. 2009) 903 N.E.2d 946, 954-955.)

Neither *Gray* nor *Ross*, singly or together, has proven unworkable. No factual premise of either decision has changed in the past 25 years. And far from having been eroded by subsequent legal developments, both cases have been repeatedly and faithfully applied by state and federal courts. There is no basis in the doctrine of stare decisis for revisiting this settled law.

LIU, J.

3

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Riccardi

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S056842
**Date Filed:** July 16, 2012

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** David D. Perez

_____

**Counsel:**

Carla J. Johnson, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka, Michael W. Whitaker and Stephanie C. Brenan, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Carla J. Johnson
P.O. Box 30478
Long Beach, CA  90853
(562) 438-0035

Stephanie C. Brenan
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2056